# In the United States Court of Federal Claims

No. 14-166C
(Filed:  January 22, 2015)

```
************************************
                                 *
ANCHORAGE, A MUNICIPAL           *
CORPORATION                      *
                                 *
              Plaintiff,         *
                                 *
        v.                       *
                                 *
THE UNITED STATES,               *
                                 *
              Defendant.         *
                                 *
************************************
```

Motion to Dismiss, Cooperative
Agreement

## OPINION AND ORDER

**DAMICH, Senior Judge**

This case arises from a contract dispute between the Plaintiff, Anchorage, A Municipal Corporation ("Anchorage" or "MOA") and the United States (the "Government"), acting through the Department of Transportation, Maritime Administration, ("MarAd"). The lawsuit concerns losses from a project jointly administered by Anchorage and MarAd to expand the Port of Anchorage in Anchorage, Alaska ("the Project").  During the course of construction, widespread damage was discovered in the Project, rendering parts of the Port unsuitable for use.

Defendant filed a Motion to Dismiss the Complaint pursuant to RCFC 12(b)(1) and 12(b)(6).  The Government alleges the Complaint should be dismissed because (1) the Court does not possess jurisdiction under the Tucker Act because the agreements relating to the project between MarAd and Anchorage are not money mandating, (2) the Complaint fails to state a claim for breach of contract or a breach of the implied covenant of good faith and fair dealing because the agreements place responsibility on Anchorage but not on the United States for the alleged breaches, and (3) the Complaint fails to state a claim as a third-party beneficiary of the contract between the Government and the construction contractor because Anchorage does not allege that the Government breached that contract.

For the reasons set forth below, the Court hereby denies-in-part with respect to counts one and two, and grants-in-part with respect to count three, the Defendant's Motion to Dismiss.

## I.        BACKGROUND

The Municipality of Anchorage determined that the facilities at the Port of Anchorage were deteriorating and outdated.  Complaint ("Compl.") at ¶ 10.  Anchorage envisioned the Project as a multi-year endeavor that would help increase the Port's ability to serve Anchorage, the State of Alaska, commercial tenants, and the United States military. *Id.*  Not having the expertise to undertake the Project on its own, MOA sought a party to provide the requisite technical expertise.  *Id.* at ¶ 12.  After considering the private sector, MOA decided to contract with the Department of Transportation, Maritime Administration ("MarAd") as part of an agency-wide initiative to embark on a port infrastructure development program.  *Id.* at ¶ 13.

MOA and MarAd executed two contracts regarding the Project.  Appendix to the Defendant's Motion to Dismiss ("DA") at 1, 7.  The first contract was executed in 2003 ("the 2003 Agreement") and described project administration, funding, and the obligations of the parties.  DA 1-6.  Following the discovery of defects in the sheet pile system in 2010, MarAd revised its agreement with MOA to increase MarAd's oversight over the Project.  Compl. at ¶¶ 66-69, 92; DA at 23.  The second contract was entered into in 2011 ("the 2011 Agreement") and superseded the 2003 Agreement.  DA at 7, 13-14.  The 2011 Agreement expired on May 31, 2012.  *Id.*

The express terms of the 2003 Agreement required MOA to "[p]rovide overall program requirements and direction of Port Expansion to MarAd."  DA at 1.  The Agreement also specified, in regard to the level of program control to be exerted by MOA, that MOA had the responsibility to "[r]eview all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MarAd . . . ." DA at 2.  MOA was also responsible for certifying completion and acceptance of the work.  DA at 6.  MOA had to accept work from the contractor and certify that the work was acceptable before a certificate of completion could be submitted to MarAd for MarAd to accept the work from the contractor.  DA at 6.

The 2003 Agreement outlined MarAd's responsibilities as primarily financial in nature, because MarAd had the responsibility to "[c]oordinate with other Federal Agencies that receive annual Congressional appropriations for Port Expansion."  DA at 2.  MarAd was also responsible for executing all financial documents, accepting transfers of non-Federal funds, and was to "[o]bligate and disburse funding for Port Expansion oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements."  DA at 3.  The parties agreed not to shift liability to the other, and they agreed that the 2003 Agreement "does not obligate either party to spend funds not specifically appropriated or allocated for actions described herein."  *Id.*

Problems with the Project were discovered upon inspection in 2010, when large-scale damage was found in the installed sheet piles.  Compl. at ¶ 66-68.  The damage resulted in large sections of the Project being unsuitable for use.  *Id*. at ¶ 80.  This was the impetus for the parties entering into a second agreement in 2011.

The 2011 Agreement redefined the roles and responsibilities of Anchorage and MarAd, outlined authorities, and assured accountability for the Project.  DA at 7.  It created a Port

Oversight and Management Organization ("POMO") to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project." DA at 8. The 2011 Agreement deleted Anchorage's responsibility to provide program requirements and direction for the Project and instead gave POMO the responsibility to "[m]anage the scope, schedule, and budget of the Project on a day-to-day basis." DA at 8. The Agreement outlined the objectives, project oversight and management organization, the responsibilities of the parties, the shared responsibilities of both parties, general provisions, the term of the agreement, and provisions regarding the termination and amendment of the agreement. DA at 7-13. The Agreement also recognized that MarAd would designate the United States Army Corps of Engineers ("USACE") to serve as a design and construction agent for the Project and perform an independent technical evaluation of the sheet pile system. DA at 7; Compl. at ¶ 78. The Agreement further expanded MarAd's responsibilities by providing that MarAd or its designee would "provide acquisition, construction, design, and quality assurance service for the Project . . . ." DA at 12. The 2011 Agreement remained in effect until its expiration on May 31, 2012. DA at 13. It was the last written agreement in effect between MarAd and Anchorage relating to the Project.

In the meantime, to aid in the construction of the Project, MarAd entered into a contract with Integrated Concepts and Research Corporation ("ICRC") in 2003 to "among other things, provide program management, design-build and related procurement services with respect to the Project's management, design and construction." Compl. at ¶ 33. ICRC in turn entered into subcontracting agreements with PND Engineers, Inc. ("PND") and Quality Asphalt Paving ("QAP"). *Id.* at ¶¶ 42-47. QAP then entered into a contract with MKB Constructors ("MKB"). In 2008, MarAd and ICRC again executed a contract "to continue performance of design-build and Project management related services for the Project." *Id.* at ¶ 37. As a result of MarAd denying ICRC's certified pass-through claim, ICRC bought three claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals. Compl. at ¶ 72. On September 28, 2012, MarAd and ICRC settled the claims, with MarAd paying ICRC $11,300.000.00 and both parties agreeing to "forever release and discharge one another from any and all liability, obligations, and claims . . . arising out of the contract to perform work at the Project." *Id.* at ¶ 73.

On August 2, 2013, the Department of Transportation Office of the Inspector General ("DOT IG") issued a report critical of MarAd for contracting to Anchorage the authority over project construction and management. Compl. at ¶ 92. DOT IG found that MarAd had "limit[ed] its role to obligating and distributing funds for project tasks." DA at 21. In its investigation of MarAd officials, DOT IG also reported that "the Agency's leadership made a policy decision that abdicated programmatic and technical control to [Anchorage] which contributed to problems with the project." DA at 19. It also noted that MarAd entered into a new agreement for the Project in November 2011 after major problems with the Project were revealed to Agency officials and the public. DA at 23; Compl. at ¶ 92.

## II.     STANDARD OF REVIEW

### A.  Standard of Review Under RCFC 12(b)(1)

3

Subject matter jurisdiction may be challenged at any time by the parties. *Booth v. United States*, 990 F.2d 617, 620 (Fed. Cir. 1993). Indeed, this Court's jurisdiction to entertain claims and grant relief, like all Federal courts, depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399, 96 S. Ct. 948, 47 L. Ed. 2d 114 (1976). The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff, who must establish jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189, 56 S. Ct. 780, 80 L. Ed. 1135 (1936). Even so, when faced with a motion to dismiss for lack of subject matter jurisdiction, a court must assume that all undisputed facts alleged in the complaint are true, and it must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The Court may look to evidence outside of the pleadings in order to ascertain the propriety of its exercise of jurisdiction over a case. *Rocovich v. United States,* 933 F.2d 991, 994 (Fed. Cir. 1991), *aff'd in relevant part, Martinez v. United States,* 281 F.3d 1376 (Fed. Cir. 2002).

### B.  Standard of Review Under RCFC 12(b)(6)

Pursuant to RCFC 12(b)(6), the Court is required to grant Defendant's motion to dismiss if it finds the Plaintiff has failed to state a claim upon which relief can be granted. In considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all of the allegations in the complaint" and "must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). The Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). In order for a claim to properly be stated, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

### III.   DISCUSSION

### A.  Count I of the Complaint survives a 12(b)(1) Motion to Dismiss.

The Government's first argument in favor of dismissal is that this Court lacks jurisdiction because neither the 2003 or 2011 Agreements are money mandating under the Tucker Act. Specifically, the Government contends that neither the 2003 or 2011 Agreements contain any right for a money remedy because they are cooperative agreements. For the reasons set forth below, the Court concludes that the Agreements are not cooperative agreements, and thus money damages can be presumed.

A plaintiff must prove that a substantive source of law creates the right to recovery of money damages, and that source of law "need not explicitly provide that the right or duty it creates is enforceable through a suit for damages, but it triggers liability only if it can be fairly

interpreted as contemplating money damages." *Hamlet v. United States*, 63 F.3d 1097, 1101 (Fed. Cir. 1995). This separate source of law can come from either a money-mandating constitutional provision, statute, or regulation, or an express or implied contract with the United States. *Lovelandies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cr. 1994). Put another way, "when a breach of contract claim is brought in the Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required." *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). There is no that both the 2003 and 2011 Agreements between MOA and MarAd are express contracts between the Plaintiff and the Government and that Plaintiff is arguing breach of contract. Because an express contract carries with it a presumption of money damages (and thus Tucker Act jurisdiction), the Defendant must show that the Agreements somehow rebut this presumption.

The Government contends that both the 2003 and 2011 Agreements between MarAd and MOA should be considered cooperative agreements under the Federal Grant and Cooperative Agreement Act ("FGCAA"). Mot. Dismiss at 16-17. The Government argues that, based on the precedent set forth in *Rick's Mushroom Serv. v. United States*, 76 Fed. Cl. 250 (2007), *aff'd*, 521 F.3d 1338 (Fed. Cir. 2008), and *Holmes v. United States*, cooperative agreements, unlike procurement contracts, are not presumed to provide monetary relief. Mot. Dismiss at 17. Additionally, the Government argues that "neither of the agreements contains any provision for any monetary remedy upon breach." *Id.* Thus, because money damages are not contemplated specifically by the contract, and money damages are not presumed in a cooperative agreement, this court lacks jurisdiction. *Id.* at 19. However, the Court disagrees that the 2003 and 2011 Agreements are cooperative agreements.

According to 31 U.S.C. § 6305, cooperative agreements are to be used when "the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support of stimulation authorized by a law . . . instead of acquiring . . . property or services for the direct benefit or use of the United States Government." The Government argues that this description fits the current situation perfectly: that the "purpose of the 2003 agreement was not for MarAd to purchase or lease anything from Anchorage" and that rather the Agreement stated "that the parties would 'work cooperatively' to 'benefit the efforts of [Anchorage] in execution of its Port Expansion.'" Mot. Dismiss at 17. While this is certainly true, it ignores the true reciprocal nature of the Agreement that leads this Court to hold that the 2003 Agreement is an express contract and not a cooperative agreement.

MOA gave MarAd approximately $302,000,000.00 towards the construction of a port. Compl. at ¶ 5. MarAd was to receive 3% of that amount in exchange for providing "specialized technical expertise and input as appropriate." Def. App. at 2. One part of the project called for the construction of a new road to directly connect the Port of Anchorage with Elmendorf Air Force Base "to facilitate quick deployments of military forces through the port without the need to use the public highway system." Compl. at ¶ 11. Additionally, the project contemplated adding "new staging areas for military deployments and dual-use facilities which can be used for military hangars for helicopters." *Id.* Thus, it is clear that the relationship contemplated between the parties goes well beyond merely transferring a "thing of value" to a local government; although the transfer of the port is a major component of the Agreements, the value

that the Government was to receive, namely money and increased military infrastructure, goes well beyond mere incidental benefit.

Furthermore, the Government itself concedes that there is a specific process that must be followed when entering into a cooperative agreement that was not followed in this case. The regulations found in 46 C.F.R. § 385.1 *et seq.* set forth "information about the Maritime Administration (MarAd) assistance regulations: Their purpose, authority, applicability, issuance, arrangement, implementation, and exception procedure." 46 C.F.R. § 385.1. At the Oral Argument held on November 5, 2014, the Government admitted that "we don't dispute that MarAd did not follow its own regulations in entering into this agreement, to the extent that it wanted to make this an official cooperative agreement under its regulations." Transcript at p. 13, lines 19-22. Thus, although the Government failed to follow its own procedures in creating a cooperative agreement, it now asks the Court to construe the Agreement as such.

For all the reasons stated above, the Court concludes that the 2003 and 2011 Agreements between MOA and MarAd are not cooperative agreements. Accordingly, the Court holds that the Agreements can fairly be interpreted as contemplating money damages, thus giving the Court jurisdiction under the Tucker Act.

## B. Plaintiff's Complaint has met the pleading standard under RCFC 12(b)(6) such that it can survive a Motion to Dismiss.

### i. Count I of the Complaint survives because there is a genuine issue of fact as to the duties of the parties under the 2003 Agreement.

The Government's second argument for dismissal is that even if this Court has jurisdiction, Plaintiff has failed to state a claim for which relief can be granted, thus necessitating dismissal under RCFC 12(b)(6). Mot. Dismiss at 19. Defendant points out seven alleged breaches of the 2003 and 2011 Agreements, comprising Count I of the Complaint. *Id.* at 22-23.[1] Defendant responds by asserting that the allegations fail, variously, because the 2003 Agreement failed to create the alleged duty for Defendant to design, construct, and/or manage the Project, that Defendant had "full legal authority to settle claims with ICRC," and that several claims must fail because they took place after the expiration of the 2011 Agreement, when there was no contractual agreement binding the parties. *Id.* at 28-30.

---

[1] Those breaches are: [(A)] failing to provide its promised expertise to design, construct, and oversee the design and construction of the Project, resulting in a Project that (except for the Dry Barge Berth) has been rendered useless and not suitable for its intended purposes; [(B)] failing to manage and oversee the 2003 MarAd-ICRC Contract and the 2008 MarAd-ICRC Contract, the effect of which was that ICRC, PND and other design and construction professionals committed breaches and independent tortious acts which MarAd simply ignored; [(C)] failing to exercise its contractual rights against ICRC to repair and replace the defective work at ICRC's own cost; [(D)] settling ICRC's claim with [Anchorage's] funds and without [Anchorage's] knowledge or consent even though ICRC first blamed its own contractors, QAP and MKB, for construction defects, and later blamed its own designer, PND, for Project defects; [(F)] by otherwise completely abdicating its responsibility to design, construct, and oversee the Project; and [(G)] by failing to perform its obligations to [Anchorage] "in good faith and for the benefit of the citizens of the Municipality of Anchorage." *Id.*

According to the 2003 Agreement, MOA's responsibilities include, *inter alia*, "provid[ing] overall program requirements and direction of Port Expansion to MARAD," "review[ing] all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD," and to "Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary." DA at 1-2. MarAd's responsibilities were, *inter alia*, to "Provide specialized technical expertise and input as appropriate to Port expansion tasks and activities," and "Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements." *Id.* at 2-3.

Defendant argues that the 2003 Agreement "created no duty in MarAd to design, construct, or manage the project." Mot. Dismiss at 24. Rather, it interprets MOA's responsibilities quoted above placing the responsibility on MOA to provide requirements for Port expansion. *Id.* Defendant further argues that MarAd's responsibilities were "almost entirely financial," *id.* at 25, and that the technical expertise it was required to provide does not include management, design, and construction of a port because "Congress did not mandate MarAd to develop the expertise to manage the port improvement development program (PIDP) until 2009, six years after the 2003 agreement." *Id.* Plaintiff, on the other hand, argues its responsibilities related to the design and construction were limited to providing specifications and reviewing plans, implicitly arguing that if its only duty was to review the plans for port design and construction, it must be MarAd's duty to create those plans. Pl.'s Response at 40-41.[2]

It is clear to the Court that at this stage in the litigation, the parties are at a disagreement as to the duties of each party under the 2003 Agreement, specifically relating to the design and construction of the port. Because this case is at the Motion to Dismiss stage, the parties have yet to conduct discovery as to this issue. Accordingly, when reviewing the Defendant's Motion to Dismiss, the Court must "assum[e] the truth of all the allegations." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). Furthermore, "the [f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Assuming as true Plaintiff's allegations that it was MarAd's duty to design and construct the Project, Plaintiff has made out a cognizable case for breach of contract. There is no dispute that completion of the Project has failed to materialize as envisioned by the Agreements between the parties. If it was MarAd's duty to design and construct the port, then, given the fact that design and construction done on the Project has been faulty, Plaintiff's cause of action for breach of contract can survive. Because there is a genuine issue of material fact as to the duties of the parties under the 2003 Agreement, the Court must deny the Motion to Dismiss at this stage.

---

[2] MOA notes that it, "like any project owner, merely retained insight into the actions of MarAd and its contractors." Pl.'s Response at 32. At the oral argument, Plaintiff analogized its duty of reviewing port design plans to the duty of a new homeowner reviewing plans for the construction of a house, noting "you review the plans and specs to make sure you're getting the four or five bedroom house that you asked for" but stating that MOA was "not taking a management role" and that the review was to "keep [MOA] informed on how [MarAd was] spending their money." Oral Argument at 74.

ii. Count II of the Complaint survives because there is a genuine issue of material fact as to the conduct of MarAd in the settlement of claims with ICRC.

The Government argues that Count II of the Complaint must be dismissed because it "fails to state a claim of breach of the implied covenant of good faith and fair dealing because the alleged breaches occurred after the term of the 2011 Agreement." Mot. Dismiss at 30. Defendant points out six different allegations made by Plaintiff in this Count, namely that Defendant breached the duty of good faith and fair dealing by: 1. Recklessly disbursing Anchorage's funds to ICRC for defective work; 2. Failing to enforce its contractual remedies against ICRC; 3. Using $11,300,000.00 in Project funds to settle the CBCA Action with ICRC without notifying or involving Anchorage in the settlement process; 4. Attempting to hide the settlement from Anchorage; 5. Refusing to participate in the disputes process mandated by the 2011 Agreement; and 6. Failing to pursue a counterclaim against ICRC at any time during either the 2003 or 2011 Agreements thereby denying Anchorage the benefit of the 2011 Agreement, which promised that MarAd would pursue affirmative claims against ICRC. *Id.* at 31.

Regarding the first allegation above, Defendant argues that it must fail because it contradicts an express term of the contract. Mot. Dismiss at 31. Anchorage, Defendant argues, had the responsibility to review and accept work before submitting it to MarAd for completion, and thus "any duty concerning reckless management of payment would fall on Anchorage, not MarAd." *Id.* at 33. With regard to the other allegations, Defendant argues that because those actions took place after the expiration of the 2011 Agreement, they could not form the basis of a breach of the duty of good faith and fair dealing because such a duty would terminate along with the expiration of the contract. *Id.* at 33. The 2011 Agreement terminated on May 31, 2012. DA at 12.

Plaintiff raises several arguments as to how MarAd breached the 2011 Agreement. Plaintiff first argues that MarAd recklessly distributed funds to ICRC because although the defective work was known to the parties in 2010, MarAd continued to pay ICRC for work done rather than pursue its right to have the defective work corrected. Pl.'s Response at 34. Plaintiff also avers that MarAd continued to act as though a contractual relationship existed between the parties even after the May 31, 2012 termination date, creating an implied-in-fact contract. *Id.* at 36. Specifically, Plaintiff mentions that POMO meetings, which were obligated by the 2011 Agreement, continued to occur for a year after 2012. Transcript at 49. During the oral argument, Plaintiff also stated that it believed that "what happened at the time was the Government made a conscious decision not to extend the contract, but to pretend to extend the contract, so that they could get to the point where they could deny [MOA] some of [MOA's] protections under the agreement." *Id.* at 48.

Again, this case is at the Motion to Dismiss stage. Assuming that the parties continued their relationship, including formalities such as POMO meetings that the parties would not usually engage in in the absence of a contractual agreement, it is at least plausible that this conduct could lead to the creation of an implied-in-fact contract between the parties. This Court has previously held that "[i]f, after the expiration of a contract, the parties to the contract continue to perform under the contract's terms, the parties' relationship is generally governed by

a new, implied-in-fact contract that incorporates the terms of the expired contract." *Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 780 (2013). Because these issues concern the conduct of various parties and officials at specific times, the parties should be allowed to conduct discovery on the issues in order to better establish what actually happened. At this stage, however, Plaintiff has adequately pleaded a cause of action to survive the Motion to Dismiss. Defendant's Motion to Dismiss is therefore denied with regard to Count II of the Complaint.

### C. Count III

Finally, the Court turns to the issue of whether Plaintiff's third count for breach of contract as a third party beneficiary can survive the Motion to Dismiss. Plaintiff argues that "MarAd breached its contractual duties to MOA by, among other things, failing to enforce its contractual rights against ICRC, and continuing to disburse funds to ICRC for defective work." Compl. at 28. It is uncontested by the Defendant that MOA was a third party beneficiary of the 2003 and 2008 Mar-Ad-ICRC Contracts. Mot. Dismiss at 35 ("The Government assumes that Anchorage was a third-party beneficiary for purposes of this motion.")[3]

A plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim. *Sullivan v. United States,* 625 F.3d 1378, 1379-80 (Fed. Cir. 2010) (citing *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003)). Not only is privity a fundamental requirement of contract law, but it is particularly important in cases involving government contracts because the "government consents to be sued only by those with whom it has privity of contract." *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984). The United States Court of Appeals for the Federal Circuit has recognized limited exceptions to that general rule when a party standing outside of privity "stands in the shoes of a party within privity." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999). Thus, under *Sullivan*, when suing as a third party beneficiary, the third party "stands in the shoes" of the injured party to the contract and sues the breaching party.

In the instant case, in order to sue the Government as a third party, MOA must allege that MarAd breached its contract with ICRC, such that MOA may stand in ICRC's shoes and sue MarAd. Plaintiff, however, has failed to sufficiently plead any facts which suggest that MarAd committed a breach of either the 2003 or 2008 MarAd-ICRC contracts. Plaintiff has failed to show any course of conduct that would lead to ICRC taking action against MarAd in court. At best, MarAd can be accused of failing to enforce contractual terms against ICRC. However, as Defendant correctly notes, "the Government's failure to enforce its contractual rights, however, cannot be the basis for a third party beneficiary claim." Def.'s Reply at 19 (*see Sullivan,* 625 F.3d at 1379 ("the Government's failure to enforce a contractual provision . . . does not amount to breach of contract by the Government.")). Because it is not apparent how MarAd breached the MarAd-ICRC contracts, MOA cannot step into ICRC's shoes and pursue a third party claim against MarAd. Accordingly, this Count must be dismissed.

---

[3] Although non-binding, the Court takes notice of the fact that in the District Court for the District of Alaska, the Court found that MOA was a third-party beneficiary of the MarAd-ICRC contracts. *See Anchorage v. ICRC et al.*, No. 3-13-cv-00063-SLG at 30-31.

## IV.    CONCLUSION

For all the reasons set forth above, the Court reaches the following conclusions.  First, this Court has jurisdiction to hear Plaintiffs breach of contract claims because the 2003 and 2011 Agreements can be fairly interpreted as contemplating money damages.  Second, Plaintiff has adequately pleaded sufficient facts to maintain an action for breach of contract.  Finally, the Court determines that Plaintiff has failed to plead sufficient facts to give rise to a claim of breach of contract as a third party beneficiary.  Therefore, Defendant's Motion to Dismiss is hereby denied-in-part with respect to Count I and Count II of Plaintiff's Complaint, and granted-in-part with respect to Count III.

The parties are directed to file a joint status report within 30 days from the date of this opinion outlining the next steps to be taken in this litigation.

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge