# In the United States Court of Federal Claims

No. 14-166C
(Filed:  May 21, 2020)
FOR PUBLICATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **ANCHORAGE, A MUNICIPAL** | \* Motion for Summary Judgment; |
| **CORPORATION,** | \* Trial; Contract Formation; Consideration; |
| | \* Genuine Issues of Material Fact Remain |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES,** | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH,** Senior Judge

Anchorage, A Municipal Corporation ("Anchorage") determined that the facilities at the Port of Anchorage were deteriorating and outdated.  Not having the expertise to undertake any project on its own, Anchorage entered into an "innovative partnership" with the Department of Transportation, Maritime Administration, ("MARAD") through two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") (cumulatively "the Agreements").  Anchorage is now before this Court alleging a breach of contract by the United States ("the Government") for losses it sustained under the Agreements.  ECF No. 1.

In lieu of an Answer, the Government filed a motion to dismiss the complaint.  ECF No. 10.  In its motion, the Government argued that the Agreements were not money mandating, but instead cooperative agreements, thus, outside this Court's jurisdiction.  ECF No. 10 at 15-19.  It further argued that the 2003 MOU was not backed by the presumption of money damages, therefore, also outside this Court's jurisdiction.  *Id*.  With regard to the 2011 MOA, the Government argued that the duties allegedly breached—settlement with its prime contractor— were not created by the Agreement because the 2011 MOA expired on May 31, 2012. *Id*. at 19-34.  After full briefing and oral argument, the Court denied-in-part and granted-in-part the Government's motion.  In denying the motion the Court held: (1) the Court has jurisdiction to hear Anchorage's breach of contract claims because the 2003 MOU and 2011 MOA could be fairly interpreted as contemplating money damages; and (2) Anchorage adequately pleaded

sufficient facts to maintain an action for breach of contract.  ECF No. 22.  However, the Court dismissed Anchorage's third-party beneficiary claim.  *Id*.

Thereafter, the Government filed its Answer.  ECF No. 23.  Discovery ensued and was completed on July 15, 2019.  ECF No. 89.  Pursuant to the scheduling order, the Government filed its motion for summary judgment on July 6, 2019, revisiting its argument raised at the motion to dismiss stage. The Government again argued that Anchorage could not prove its breach of contract claims because Anchorage could not establish that a commercial contractual obligation existed.  ECF No. 90 at 2. The Government further argued that the 2003 MOU was not supported by consideration.  *Id*. at 21. With regard to the 2011 MOA, the Government argued that no implied-in-fact agreement existed to extend the parties' obligations under the 2011 MOA. *Id*. at 29.  Anchorage filed its response in opposition on July 26, 2019, ECF No. 98, and the Government filed its reply on August 20, 2019.  ECF No. 100.  In its reply, the Government raised a new issue–that not only did the Government receive authority from Congress to administer funds, but it also received authority from Congress to administer contracts and provide Federal project oversight.  *Id*. at 1.  This, according to the Government, rendered the 2003 MOU void.  *Id*.  Anchorage then filed a motion to strike new arguments raised for the first time in defendant's reply memorandum, or in the alternative, leave to file a sur-reply.  ECF No. 101.  The Court denied Anchorage's motion to strike and granted Anchorage's motion to file a sur-reply.  ECF No. 103.  Anchorage timely filed its sur-reply on September 18, 2019.  ECF No. 104.

On October 10, 2019, the Court held a status conference informing the parties that the issues raised in the Government's motion for summary judgment required a "mini-trial" to determine the factual disputed issue of consideration.  ECF No. 106.  The Court was "exclusively interested in the financial arrangement for consideration purposes between Anchorage and the Government, money or otherwise."  ECF No. 133 at 2.

Trial was held on February 18-19, 2020, in San Francisco, California.  However, prior to trial, the parties filed a stipulation.  The stipulation stated that: "MARAD received a total of $163,400,000 from Anchorage for administration on the Project."  ECF No. 118 ¶ 9.  This alone, would lead the Court to find consideration—that Anchorage paid money for services—which it does.  Additionally, at trial, the evidence showed that Anchorage's money was spent by MARAD to provide services, contrary to the Government's assertion that it was not.  The evidence also showed that the Government received non-monetary consideration as well.  Thus, the Court finds that there was consideration for the Agreements and, therefore, the Agreements are valid, binding contracts.  The Court further holds that there remain disputed material issues of fact. For these reasons and the for the reasons set forth below, the Court **DENIES** Defendant's Motion for Summary Judgment.

I.      **Background**

In 1999, the Port of Anchorage[1] received a Master Plan, commissioned by the Municipality of Anchorage, outlining the steps the Port needed to take to replace deteriorated facilities and meet increasing demands.  PX1.[2]  The Master Plan was commissioned to guide the Port's growth for the next 20 years.  Trial Tr. at 268:16-17.  As part of the Master Plan, the Plan recommended a "north access route to Anchorage military bases" in order to accommodate munitions shipments.  PX1 at ES-3.  The Port serves as the entry point for military operation at the Joint Base Elmendorf Richardson.  *Id.*

In May 2001, William Sheffield, former Governor of Alaska, was appointed as Port Director.  ECF No. 60 at 6.  Gov. Sheffield was responsible for executing the Master Plan.  *Id.* Gov. Sheffield hired lobbyists to help obtain Federal appropriations.  ECF No. 90 at 7.

The Port of Anchorage Intermodal Project ("Project") was to be a multi-year infrastructure project that would replace deteriorated and outdated facilities at the Port.  ECF No. 97 at 2.  In 2001, Anchorage began pursuing federal agencies to help with the Project.  *Id.* at 4. After discussions with various agencies, Anchorage and MARAD ultimately entered into an agreement.  *Id.*  In furtherance of this partnership, the U.S. Government enacted legislation authorizing federal funds for the Project and non-federal[3] share funds to MARAD.  *Id.*

Cheryl Coppe was hired as executive administrator for the Project, ECF No. 90 at 7; Trial Tr. at 266, and "was pivotal in the formation of the 'innovative partnership.'"  ECF N0. 90 at 7.   Ms. Coppe drafted the 2003 MOU, which was ratified by the Anchorage Municipal Assembly, on June 24, 2003, after signatures by both Anchorage and MARAD, in March 2003.[4] ECF No. 98 at 7; Trial Tr. at 291:12-17.

In relevant part, Section IV of the 2003 MOU set forth Anchorage's responsibilities which included:

> Provide overall program requirements and direction of Port Expansion to MARAD.
>
> . . .

---

[1] The Port of Anchorage is a department within the Municipality of Anchorage.  ECF No. 97 at 2 fn.2

[2] "PX__" refers to Plaintiff's exhibits admitted at trial.

[3] Federal funds included funds from the Department of Defense, Federal Transportation Administration and Federal Highway Administration. Trial Tr. at 166-169.

[4] The ratification of the 2003 MOU came after MARAD had already hired Integrated Concepts and Research Corporation ("ICRC") for the design and construction of the Project. The ratification, according to Ms. Coppe, was just "pro forma." Trial Tr. at 304:15-18.   The Court agrees.  The evidence showed that MARAD and Anchorage were moving forward as if the MOU had been ratified.

Review all plans, specifications, and status reports submitted by the primary contractor before submission to MARAD for inclusion in its permanent federal project file.

. . .

Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design construction or rehabilitation as necessary.

Section V of the 2003 MOU set forth MARAD's responsibilities, which included:

Provide specialized technical expertise and input as appropriate to Port Expansion tasks and activities.  Administrative costs to be used for MARAD participation under this project will be 3% of funding received.

. . .

Obligate and disburse funding for Port Expansion oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

PX9.

To aid in the construction of the Project, in 2003, MARAD entered into an Indefinite Delivery/Indefinite Quantity ("IDIQ") contract with Integrated Concepts and Research Corporation ("ICRC") for the design and construction of the Project.[5]  Pl. App. at 612.[6]  ICRC qualified as an 8(a) small business under the Small Business Administration's ("SBA") 8(a) program.  ECF No. 90 at 10-11.  In 2008, MARAD and ICRC again executed a contract "to continue performance of design-build and Project management related services for the Project."  *Id.*

MARAD selected the open cell sheet pile structure to construct the Project.  Pl. App. at 1168.  Construction began, but then in 2010, all construction stopped due to damaged sheet piles.[7]  ECF No. 97 at 16.

---

[5] Originally, MARAD entered into a contract with Koniag Services, Inc., an Alaskan Native Corporation, but shortly after execution of the contract, MARAD determined KSI was not equipped to perform so MARAD agreed to novate the contract to ICRC.  For continuity, the Court will use ICRC in place of KSI at all times.

[6] "Pl. App. __" refers to Plaintiff's appendix to its motion in opposition, ECF No. 97.

[7] The Court viewed the site on August 1, 2019.  The Court saw the significant damage to the sheet piles that had been removed as well as the buckling of the sheet piles that remained creating an unfinished pier wall.  The Court also observed sink holes that were a result of the buckling sheet piles.

In November 2011, the parties renegotiated the agreement with MARAD, resulting in the 2011 Memorandum of Agreement. Trial Tr. at 211-212; PX24. The 2011 MOA redefined the roles and responsibilities of Anchorage and MARAD, outlined authorities, and assured accountability for the Project. PX24. It created a Port Oversight and Management Organization ("POMO") to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the project." *Id.* The POMO was made up of a committee of decision makers from both Anchorage and MARAD, who would hold frequent meetings to address issues related to the Port construction. ECF No. 97 at 17. The 2011 MOA continued the language from the 2003 MOU: "the parties will transfer to MARAD on a quarterly basis 3% of all funding received under this project to cover MARAD's costs and added: "related to the project until May 3, 2012." Trial Tr. at 216; PX 24.

After the MOA was executed, funds were transferred to MARAD. Trial Tr. 219:5-7. In practice, MARAD would request money and Anchorage, in turn, would pay. Trial Tr. at 219-20; 352-53. The 2011 MOA also stated that MARAD was "[p]ursuant to Contract Disputes Act, 41 U.S.C. §§ 7001-7013 [sic], to administer claims submitted by MARAD contractors and coordinate and cooperate with MOA/POA in affirmative and defense claims consistent with federal contract law." PX 24. The 2011 Agreement remained in effect until its expiration on May 31, 2012.

On December 28, 2011, ICRC brought two claims under the Contract Disputes Act of 1978 to the Civilian Board of Contract Appeals. Pl. App. at 1426-1459. MARAD settled with ICRC in the amount of approximately $11,300,000.00. *Id.* at 1460-63.

## II.     Statutory Framework

MARAD received authority from Congress to implement the Project through the Transportation Equity Act for the 21st Century ("TEA-21"), enacted June 9, 1998, as Public Law 105-178. The legislation authorized funds for the project:

> (3) Intermodal center authorizations. – Notwithstanding any other provision of law, each of the following projects are eligible for funding under section 5309(m)(1)(C) of title 49, United States Code:
>
> . . .
>
> (F) Port of Anchorage Intermodal passenger and freight facility.

*See* Section 3030(d)(3) of the Transportation Equity Act for the 21st Century (Public Law 105-178) as amended by Section 345(2)(F), Title III, Division I, of the Consolidated Appropriations Resolution, 2003 (Feb. 20, 2003) ("TEA-21").

On that same date, MARAD received appropriated funds through the passage of the Consolidated Appropriations Resolution which stated:

SEC. 626.  Any amounts previously appropriated for the Port of Anchorage for an intermodal marine facility and access thereto shall be transferred to and administered by the Administrator for the Maritime Administration including non-Federal contributions.  Such amounts shall be subject only to conditions and requirements required by the Maritime Administration.

Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7 §§ 345, 626, 117 Stat. 11, 106, 418 (Feb. 20, 2003).

A subsequent appropriation was further made in 2005, under the Safe, Accountable, Flexible, Efficient, Transportation Equity Act: A legacy for Users ("SAFETEA-LU"), Pub. L. No. 109-59 § 10205, 119 Stat. 1144, 1934 (Aug. 10, 2005).

The funds transferred to MARAD to date total approximately $306,000,000.  ECF No. 118 at 2; Trial Tr. at 8:8. Of this amount $139,000,000 were federal funds and $163,400,000 were funds from Anchorage.  ECF No. 118 at 2; Trial Tr. at 8:17. There is no dispute that $163,400,000 was transferred by Anchorage to MARAD through the U.S. Treasury.  *Id.*

## III.      Trial Testimony and Discussion

The Government raises three theories as to why judgment should be granted in its favor. First, the Government argues that the 2003 MOU was not a contract to hire MARAD because Anchorage could not prove that it paid a 3% fee to hire MARAD to provide services.  Trial Tr. at 8.  Instead, the Government argues that the entire amount of $163,400,000 was used under the federal procurement contract by MARAD to pay ICRC for construction costs and that all administrative costs came from federal appropriated money, only.  Trial Tr. at 19-20.   Second, the Government advances that the military road was merely an ancillary benefit, not consideration.  Trial Tr.  23-24.  And third, the Government advances the argument that Congress only authorized MARAD to administer the funds for the project, and, in addition, raises its new argument—that the origination of the partnership was Congress, not Anchorage, therefore the MOUs are void.  Trial Tr. at 375.

At trial, the Court heard testimony regarding the financial arrangements between MARAD and Anchorage.  It also heard argument on the Government's contention that MARAD was only on the Project to administer the money—nothing else.  The Government presented its case with two witnesses, David Bohnet and Alexander Caine.  Anchorage called three witnesses – Colonel George Vakalis, Cheryl Coppe, and Lucinda Mahoney.  After hearing the testimony and reviewing the evidence, the Court finds that the evidence is clear—there was consideration and the 2003 MOU and 2011 MOA are valid and binding contracts.

### A.  Formation of a Contract

In order to prove that Anchorage "hired" MARAD to "provide its expertise to design, construct, oversee and manage the [Project]" compl. ¶ 5, Anchorage must prove the elements of contract formation for that alleged duty.  Specifically, Anchorage must prove: (1) offer, (2) acceptance, (3) actual authority, and (4) consideration.  *Massie v. United States*, 166 F.3d 1184,

1188 (Fed. Cir. 1999).  The Government does not take issue with the first three elements.
Instead, and as stated earlier, the Government contends that consideration is lacking.
Consideration is a bargained for exchange between parties to an agreement and may consist of
promise or performance.  Restatement (Second) of Contracts Sections 71,72 (1981).  At its most
basic, consideration is a promise for a promise.  Consideration also means mutuality of
obligation. *Total Medical Mgmt. v. United States,*104 F.3d 1314 (Fed. Cir. 1997).

### 1.    Anchorage Paid At Least 3% To MARAD

The Government argues that the 2003 MOU was not a contract to "hire" MARAD
because Anchorage could not prove that it paid a 3% fee to hire MARAD to provide
administrative costs.  ECF No. 90 at 23.  Instead, the Government argues that MARAD spent all
of Anchorage's funds to pay ICRC for construction costs, only.  The Federal money, according
to the Government, was used to cover MARAD's administrative costs, not Anchorage's money.
Trial Tr. at 19-20.  To prove this contention, the Government called David Bohnet, a MARAD
employee.  Mr. Bohnet began working as a federal employee in September of 2012, and at that
time, he had 30 grants that he was responsible for managing, including this Project.  Trial Tr. at
37, 92, 109.   As part of his responsibilities, and in preparation of trial, Mr. Bohnet was tasked
with preparing spreadsheets tallying all the funds appropriated, transferred, and expended in
connection with the project.[8]  Trial Tr. 40; *see* DX39, DX40, and DX41.[9]  The first round of
spreadsheets was compiled in April 2016.  Trial Tr. at 44:5.  However, prior to this trial, Mr.
Bohnet updated the spreadsheets in December 2019, well after the close of discovery.  Trial Tr.
at 56:20. The updates, according to Mr. Bohnet, were necessary for accuracy purposes to show
that all monies had been spent.  Trial Tr. at 44.

 On direct examination, Mr. Bohnet gave an in-depth review of his reports.  DX39, titled
"Anchorage Fund Summary," detailed all the expenditures for administrative purposes and
construction purposes as well as the individual task orders on the job.  Trial Tr. at 42-43.  Tab 2
of DX 39 contained a second summary of expenditures, updated in December 2019, to show the
payment of a settlement.  Trial Tr. at 44-45.  DX40, was a summary of Anchorage's
administrative expenses.  In his updated version, Mr. Bohnet removed certain calculations
regarding salaries.  Trial Tr. at 47:4-10.  DX41 was titled the "Delphi Report Compilation."
Trial Tr. at 47.  Delphi was the invoicing system MARAD used for all its expenditures.  Trial Tr.
at 48:24-25.  This report tallied purchase order summary and accounts payable reports.  Trial Tr.
at 49-51.  The Delphi Report identified the funding source—that is—where the funds came from
to pay for the administrative and construction costs.  Trial Tr. at 51-52.  Funds were provided by
the Department of Defense, Federal Highway Administration, Federal Transit Administration,
Port of Anchorage and the state municipality of Alaska.  Trial Tr. at 52.  This report, DX 41, was
used to compile DX39.  Trial Tr. at 58:12-14.

The purpose of the spreadsheets was to show where every dollar, federal and nonfederal,
was expended, and in particular to show that all of Anchorage's money was spent on

---

[8] In making his spreadsheets, Mr. Bohnet considered the state and municipal dollars the
same.  Trial Tr. at 114:8-20.

[9] "DX__" refers to Defendant's exhibits admitted at trial

construction costs, not administrative costs.  At his deposition, Mr. Bohnet defined administrative costs as anything not construction related.  Trial Tr. at 99:7-11.  At trial, Mr. Bohnet expanded his definition to "other elements  . . . that are not nails and hammers."  Trial Tr. at 99:12-15.  He did not elaborate other than that statement.  Significant to this issue was Mr. Bohnet's testimony regarding DX41.  This report, the Delphi Report which tallied all the expenditures, was the evidence Mr. Bohnet relied upon when asked by counsel on direct examination: "Do you know how much of the nonfederal money was spent on construction?" allowing him to state: "All of it."  Tr.  Transcript at 60:5-7.  Relying on DX40, Mr. Bohnet testified when asked: "Were any of MARAD's administrative costs in DX40 paid out of the nonfederal contribution?" he replied: "No."  Tr. Transcript at 61:4-6.  Mr. Caine, Budget Director of MARAD, echoed this sentiment. Trial Tr. at 147:12-14. ("On the nonfederal side, there was no – no administrative charges to the nonfederal source funds.").  Mr. Caine also reviewed Mr. Bohnet's spreadsheets and found them to be accurate.  Trial Tr. at 132-33.  In concluding his testimony, Mr. Bohnet reaffirmed that his reports showed that Anchorage did not pay MARAD any money for administrative costs.  Trial Tr. at 87:14-16.  Instead, according to Mr. Bohnet, his reports showed that Anchorage's money was predominately spent on the ICRC contract.  Trial Tr. at 86:17-19.

It became clear, however, on cross-examination, that the spreadsheets told a different story.  For instance, in DX39 certain task orders that were not construction costs were paid for by Anchorage.  A suitability study was paid for by Anchorage in the amount of approximately $3.4 million.  Trial Tr. at 97:6-18, DX39.97-39.107.  Although the cost was placed under construction costs in the Delphi Report, Mr. Bohnet could not say whether or not it was a construction cost or administrative cost.  Trial Tr. at 99:14-20.  In fact, he didn't know what the costs were at all. Trial Tr. 99:14-16.  In the same spreadsheet, DX39, there was a line item for a DCAA audit, conducted by the defense auditing agency, in the amount of $118,280 and paid for by Anchorage.  Trial Tr. at 100:6-28.  Mr. Bohnet could not explain what the expenditure was for, yet he put it in the construction cost ledger portion of his spreadsheet.  Trial Tr. at 101:3-5. Another line item was for $199,769.46 labeled 2DFAS Elmendorf.  Trial Tr. at 101:8-21.  That too was paid by Anchorage and Mr. Bohnet could not again ascertain as to whether it was for administrative or construction costs.  *Id*.  The spreadsheet also showed that money was paid to the Department of Justice in 2013 and 2014 in the amount of $267,224.  Trial Tr. at 102:5-18. When pressed, Mr. Bohnet admitted that the costs associated with this line item were "presumably for legal expenses."  Trial Tr. at 103:8-10.   Yet, he still labeled the costs as construction costs.   DX39 further showed that Anchorage paid for two settlements in the amounts of $1.6 million and $11.2 million.  Trial Tr. at 105:8-25. What DX39 did not show, and Mr. Bohnet admitted, were any task orders showing that Anchorage paid ICRC.  Trial Tr. at 107-08.  In fact, Mr. Bohnet testified that MARAD paid all the invoices that came in from ICRC.  *Id*.

With regard to DX40, Mr. Bohnet's new 2019 version related to changes regarding salaries.  Trial Tr. at 108.  In the updated 2019 report, that line item—salaries—was removed at the direction of counsel.  Trial Tr. at 109:3-6.  In the 2016 report, MARAD carried a line item for full-time employee salaries—$3.2 million—from 2007 through 2019.  DX40.2 (Administrative Contractors).   And interestingly, Mr. Caine testified that it was very important for the Government to accurately reconcile its spending on a monthly basis.  Trial Tr. at 159. Yet, when questioned with regard to missing salaries from the spreadsheets he was not able to

say why the salaries were removed. *See* Trial Tr. 154-166. In fact, Mr. Caine's testimony revealed that he only looked at the spreadsheets to make sure that there were no undelivered orders and to reconcile the amounts. Trial Tr. at 166:6-16.

The evidence clearly showed mutuality of obligation. There is no dispute that Anchorage transferred $163 million to MARAD. That transfer was made in exchange for services that MARAD offered to provide to the project. Mr. Bohnet's testimony proves that MARAD spent its money on administrative costs. The reports showed that MARAD took over $14 million out of Anchorage's funds and used it to pay for things like legal fees, the settlement of claims that were filed against the MARAD, for DCAA audits and salaries—which clearly fall within the guise of administrative expenses. The administrative expense incurred by MARAD and paid for out of Anchorage's money was well in excess of 3% of $163 million. Therefore, the Court finds that there was consideration for both Agreements. Even so, the Court will address the nonmonetary benefits as well.

## 2.  There Was Also Nonmonetary Consideration

The Government did not put any evidence on to rebut the military benefit piece of this Project but instead argued that maybe there were military benefits, but if there were, they were only paid for out of federal dollars. Trial Tr. at 23-24. However, there was no proof at trial supporting this claim. Instead, Anchorage's witness, Col. Vakalis, testified as to the military benefits received by the Government. Ms. Coppe also testified as to the military's involvement.

 Col. Vakalis was employed by Anchorage from 1994-2000. Trial Tr. 191:17-23. He was the operations manager from 1994-1998 and municipal manager from 1998-2000. Trial Tr. 192:5-10. He was responsible for overseeing Port operations. Trial Tr. at 193:1-24. He left in 2000 and returned to the Port as municipal manager from 2009-2015 with basically the same responsibilities. Trial Tr. at 194:3-25. Prior to his military retirement, Col. Vakalis was garrison commander for three army posts in Alaska, including Elmendorf Air Force Base. Trial Tr. at 196:21-24.

Col. Vakalis testified that the Project was built to satisfy infrastructure needs the military had expressed all the way back to 1994. Trial Tr. at 192:5-7. It was part of the 1999 Master Plan. Trial Tr. 195:22-23. He further testified about the need to have these infrastructure improvements to facilitate deployments back when he was the garrison commander. Trial Tr. at 198-201. In his capacity as municipal manager coupled with his history as garrison commander, Col. Vakalis testified that the $163 million along with the federal money was intended to build a dual-use facility for the people of the state of Alaska and for the military. Trial Tr. 207-208. This was a huge project, and Col Vakalis testified that when Anchorage paid $163 million they were paying for an entire project, not just pieces of a project. *Id*.

Ms. Coppe also testified that she drafted a "Purpose and Need Statement" in April 2002, which discussed the proposed Port expansion as being critical to the military's rapid deployment capabilities. Trial Tr. 274:9-24; PX4. This was sent to MARAD before the 2003 MOU was signed. Trial Tr. 274-75.

Additionally, MARAD, all the way up until July of 2019, posted these military benefits on its website.  Trial Tr. at 203-08; PX48.   Specifically, it boasted:

- The project has added a new direct road access between the Port and Elmendorf Air Force Base to facilitate quick deployments of military forces through the port and negating the need to use the public highway system, thereby transiting between secure facilities.

- The direct road access to Elmendorf AFB has also allowed for the mining of fill material on Elmendorf property which is being used in creating the new Port facility.  The mining of this fill material is also reduction a flight path hazard at the end of the North-South Runway on Elmendorf providing a win-win solution for both the Port and Elmendorf.

- The project adds new staging areas for military deployment and provides dual-use facilities which can be used by the Port for maintenance activities or by the military as hangars for helicopters new staging areas for military deployments and dual-use facilities which can be used for military hangars for helicopters.

PX48 at 2.  Col. Vakalis testified that the road was actually constructed and is currently being used.  Trial Tr. at 205:24. He further testified that the staging area was constructed and also being used.  Trial Tr. at 207:8-13.

Mr. Bohnet acknowledged that he has construction experience through his work as grants management specialist and admitted that construction projects require project management. Trial Tr. at 94.  The evidence showed that the program management costs which were required to supervise and manage the construction work at this project were paid for out of Anchorage's money.  *See* DX39, Tab TO 0112 ("Task Order").  This Task Order related to Project Management Office.  Trial Tr. 254:13-15.  Col. Vakalis testified that one would need project management to build staging areas, direct access road and to reduce the flight path hazard.  Trial Tr. at 255:11. And the Task Order clearly showed that Anchorage's funds were used to pay for this.  Trial Tr. 256:8-13.  Thus, the evidence showed that the military gained direct benefits as a result of the Agreements; therefore, the Court finds that there was nonmonetary consideration as well.

Because the Court finds that there was consideration—both monetary and nonmonetary—the Court finds that the Agreements are binding and valid contracts.

### B.  The Agreements Are Not Void[10]

The Government argues that the three obligations found in the Agreements that are alleged to have been breached were created by law rather than through the execution of the Agreements.  This, according to the Government, relieves MARAD of the obligations, promises, and duties it made to Anchorage through the Agreements, thus making the Agreements void. The Government argues that the legislation—TEA-21 and the Consolidated Appropriations Resolution in 2003—did three things: (1) it gave MARAD the directive from Congress to administer the Port Project; (2) it gave MARAD the ability, which it didn't have, to spend Anchorage's money which was what Anchorage used to induce Congress to put the Federal agency in charge of the Project; and (3) the statute gave MARAD the ability to put conditions and requirements on it.  *See generally* ECF No. 100; *see also* Trial Tr. at 14-15.  The Court disagrees with all of these arguments.

Neither party disagrees that Anchorage, through Gov. Sheffield, hired lobbyists to pursue Federal funding to assist with the Project.[11]   Neither party disagrees that Congress enabled MARAD to receive authority to carry out the Project.  The disagreement becomes what authority was given to MARAD.  In other words, did MARAD receive general authority to administer the project or did Congress specify how MARAD was to administer the project, leaving no room for contractual obligations to arise between MARAD and MOU?

In looking at the history of the relevant legislation regarding the Project, the Court discerns nothing other than the normal process of authorizing an agency to do something and then appropriating the money to do it.

Specifically, MARAD received authority from Congress to carry out the Project through TEA-21.  Originally, TEA-21 authorized federal surface transportation programs for highways, highway safety, and transit for the 6-year period 1998-2003.  But then, in 2003, TEA-21 was amended to authorize funds specifically for the Project:

> (3) Intermodal center authorizations.--Notwithstanding any other provision of law, each of the following projects are eligible for funding under section 5309(m)(1)(C) of title 49, United States Code:
> . . .
> (F) Port of Anchorage Intermodal passenger and freight facility.

---

[10] In its reply brief, the Government changes its theory.  It is well settled that reply briefs are only for the purpose of *replying* to a plaintiff's brief, not, as here, to put forth new theories of the case.  The Court allowed the brief and allowed Anchorage to file a sur-reply.  However, the Government is warned not to do this in the future.

[11] The Government seems to argue that the lobbying efforts "induced" the Congress to enact the appropriations statute and that that inducement voids the Agreements.  ECF No. 90 at 6-11; Trial Tr. 12-14, 375-376.  This argument is without merit.  Anchorage hired lobbyists in order to secure the legislation.  The Congress then passed the appropriations statute.  This is a common every day activity within the Congress.  And the appropriations statute is just that—an appropriations statute giving money to a Federal agency to carry out the Project.

Thus, the 2003 amendment to TEA-21 specifically provided MARAD authority to carry out the Project.

Then, once MARAD had authority to carry out the Project, MARAD received appropriated funds to carry out the authority granted to it by TEA-21 through the following:

> SEC. 626. Any amounts previously appropriated for the Port of Anchorage for an intermodal marine facility and access thereto shall be transferred to and administered by the Administrator for the Maritime Administration including non-Federal contributions.  Such amounts shall be subject only to conditions and requirements required by the Maritime Administration.

Consolidated Appropriations Resolution 2003, Pub. L. No. 108-7 §§ 345, 626, 117 Stat. 11, 106, 418 (Feb. 20, 2003).[12]

Somehow, the Government converts the general statutory language to administer the Project into a directive to enter into a contract with ICRC:

> The appropriate interpretation of the statute is that Congress authorized MARAD to administer the ICRC contract to complete the Project and to disburse all Project funds to that contract. *The "administer" language is the operative grant of authority;* the "conditions and requirement" language merely supported the grant of authority.  If Congress had not intended for MARAD to administer a Federal contract to complete the Project, there would have been no reason to afford the agency the ability to have non-Federal contributions transferred to it so that those funds could be disbursed to the ICRC contract along with the appropriations.

ECF No. 100 at 4 (emphasis added).

The Government confuses "authorization" and "appropriation" by interpreting the appropriations language as its "grant of authority."  However, the grant of authority came from TEA-21—the authorization statute, not the appropriations statute.  And it is clear that the appropriations statute is silent with regard to how MARAD should administer the Project.  Indeed, with regard to administration of the Project, the appropriations statute states that "any amounts previously appropriated . . . shall be transferred to and administered by [MARAD]." The statute is clear: it is speaking to any amounts of funds that had previously appropriated for the Project be transferred to and administered by MARAD.  The only limitation on how MARAD should administer the Project is that: "Such amount shall be subject only to conditions and requirements required by the Maritime Administration."  Thus, the Court is perplexed as to how the Government can read the statute to require MARAD to administer the ICRC contract.[13]

---

[12]  SAFETEA-LU was a subsequent appropriation in 2005.

[13]  Intertwined in this argument is that the statute also mandated that MARAD chose ICRC because it was an 8(a) small business.  This argument must fail for the same reasons.

The Government further tries to use the appropriations bill language to suggest that this was a congressional grant of authority. Specifically, the Government equates "administer funds" with "administer contracts." The Court is not persuaded. Authority, as a prerequisite to an appropriation, means "legal authority to carry out a program." *See The Government Contracts Reference Book* (Nash, Schooner et al., 4th ed. 2013) (citations omitted). In contrast, an appropriation is "[a]n act of Congress permitting federal agencies to incur *obligations*." *See The Government Contracts Reference Book* (Nash, Schooner et al., 4th ed. 2013). "An obligation is a definite commitment by the government to spend appropriated funds. A binding contract is an obligation." *Id.* And "appropriated funds" is defined as "funds made available by Congress for specified purposes, including formation of contracts." *Id.* If the Court were to accept the Government's argument, government contracting would not exist because all obligations would be owed to Congress, not the agency. The directive to administer funds means those funds that are available for obligation, thereby carrying out what the appropriations statute is meant to do. By interpreting the directive "to administer funds to mean "administer contracts," MARAD would render obsolete all duties contained in government contracts. Instead, "administer funds" in an appropriations statute grants the authority to an agency to incur obligations by the formation of contracts. It does not tell the agency how or where to enter into those contracts. And in this case, MARAD entered in the Agreements with Anchorage and contracted with ICRC.

Here, it is clear, the appropriations statute by its very definition, permits an agency to incur obligations through binding agreements. And MARAD carried out this authority to obligate appropriated funds through the execution of the Agreements.

And finally, the Government argues that the "clearest proof that MARAD's obligations were created by law, not contract, is the fact that MARAD executed the Federal procurement contract with ICRC and administered the appropriations with Federal oversight before the 2003 MOU was executed." ECF No. 100 at 6. However, at trial, Ms. Coppe testified that the ratification of the 2003 MOU was just "pro forma." Trial Tr. at 304:15-18. The Court agrees. The evidence showed that MARAD and Anchorage were moving forward as if the MOU had been ratified. For instance, the Government admits that "[o]nce Congress authorized MARAD to 'administer' the funds for the Project, Anchorage and MARAD worked out the details of their 'innovative partnership' . . . ." ECF No. 90 at 12. Ms. Coppe worked with Gene Simmons, the Contracting Officer for MARAD on the particulars. *Id.* She then sent a draft MOU to MARAD on March 1, 2003, to which MARAD provided no significant edits. *Id.* Thereafter, on March 14, 2003, MARAD signed the 2003 MOU. JX2; PX9. Then two months after MARAD's signature on the 2003 MOU, MARAD entered into the procurement contract, on May 30, 2003. PX12. The 2003 MOU was ratified less than one month later, on June 24, 2003. JX2. The Government also admits "Anchorage, MARAD, and ICRC worked collectively to advance the Project from 2003 to 2012." ECF No. 90 at 15. Thus, it is clear that the parties were moving forward as if the ratification had occurred and that the ratification was indeed just "pro forma."

### IV.    Summary Judgment

In evaluating a summary judgment motion, the Court draws justifiable inferences in favor of the non-moving party.  *See Tolan v. Cotton*, 572 U.S. 650, 657 (2014).  Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  RCFC 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material fact is one which will affect the outcome of the case.  *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986).   In deciding a motion for summary judgment, the Court does not resolve factual disputes, but ascertains whether material disputes of fact are present.  *Id*. at 250.

### A.  The Government Was Authorized to Receive the 3% Fee

The Government advances the argument, in its motion for summary judgment, that "MARAD had no authority to either charge fees or retain any amounts collected consistent with the rule against augmentation of appropriations."  ECF No. 90 at 24.  The Government cites to Federal fiscal law principles, including the U.S. Constitution, the Miscellaneous Receipts statute (31 U.S.C. § 3302), the GAO Redbook, and two Comptroller General opinions.  However, the cited material is only instructive on what the Government is required to do internally when handling appropriated funds.

First, the Government asserts that under U.S. Constitution Article I, § 9, Cl. 7, provides that Treasury money may not be drawn unless the legislature passes an appropriation.  However, Congress did pass an appropriation.  *See* 2003 Pub. L. No. 108 7, 117 Stat. 11, 106, §626 (February 20, 2003).   Indeed, the appropriated funds were to be used on the Project and to be administered by MARAD.  *Id*.  Nowhere in the statute does Congress prohibit MARAD from charging a 3% fee.  Instead, the appropriation specifically grants MARAD the authority to put conditions and requirements on any amount of money previously appropriated for the Project including non-Federal contribution.  *Id*.  Those conditions and requirements resulted in the 2003 MOU.  And that agreement provided for the 3% fee to be paid as consideration for MARAD's services.  Congress did not prohibit this action.

Second, the Government asserts the Miscellaneous Receipts statute (31 U.S.C. §3302) precludes MARAD from retaining funds from Anchorage.  Yet, the statute merely provides that officials and agents of the Government must promptly deposit money they receive into the Treasury, and does not prohibit the 3% fee.

Third, the Government argues that MARAD lacked the authority to retain any of the Federally-appropriated project funds for agency use.  ECF No. 90 at 24.  Relying on the GAO Redbook's rule against augmentation, the Government argues that agencies may not "transfer funds between appropriations without specific authority."  ECF No. 90 at 24 *citing* Principles of Federal Appropriations Law (GAO Redbook) (4th Edition, 2016 Revision) at 6-162-6-170.  However, augmentation is not at issue.  And, nowhere in the legislation did Congress prohibit MARAD from accepting a fee.

Fourth, and lastly, the cited GAO opinions are not dispositive as well as Anchorage correctly points out:

> because (1) GAO opinions and decisions on appropriations law are internal
> to the Government and provide direction to agency and government
> officials involving the use of, and accountability for, public funds, and do
> not affect agreements between the Government and a private party; (2) the
> cited opinions do not state that a contract lacks consideration because it
> violates the Miscellaneous receipts statute; and (3) the cited opinions
> involve Government agencies attempting to augment, obligate, and increase
> funding and appropriations and/or allocate funding to other needs without
> prior legislative approval, which is not the case here. The money was
> approved by Congress for the Project and was used for the Project,
> including the expenses incurred by MARAD in administering the work.

ECF No. 97 at 28.

Therefore, for the reasons set forth above, the Court holds that MARAD was authorized to receive the 3% administrative fee.

### B.   Remaining Genuine Issues of Material Fact

The remaining disputed issues of material fact are as follows.

- It is clear from the 2003 MOU that MARAD had a duty to oversee, design and construct the Project.  However, it is the Government's contention that Anchorage was in total control of the project.  *See* ECF No. 90 at 14-16. Anchorage, disagrees, and as such, the question as to whether Anchorage had control of the Project and was the ultimate decision-maker remains a disputed issue of material fact.

- Whether MARAD's 2012 settlement with ICRC was a breach of the implied covenant of good faith and fair dealing because the 2011 MOU had expired, and no implied-in-fact contract was created remains a disputed issue of material fact.

## V.   CONCLUSION

For the reasons set forth above, the Court finds the 2003 MOU and 2011 MOA binding and valid contracts.  The Court further holds that the Agreements are not void and that MARAD was authorized to receive the 3% fee.  However, there remain genuine issues of material fact as enumerated above.  For these reasons, the Court **DENIES** Defendant's motion for summary judgment.

The Court sets a telephonic status conference for **Tuesday, June 2, 2020 at 2:00 p.m. EDT** to discuss the trial schedule.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge