# In the United States Court of Federal Claims

No. 14-166C
(Filed:   December 9, 2021)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | \* |
| **ANCHORAGE, A MUNICIPAL** | \* |
| **CORPORATION,** | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| **THE UNITED STATES,** | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH,** Senior Judge

The dispute between Anchorage, A Municipal Corporation ("Anchorage") and the United States ("the Government") came before this Court more than seven years ago on Anchorage's complaint alleging breach of contract on a Port of Anchorage Intermodal Expansion Project ("the Project" or "PIEP") for which it had entered an "innovated partnership" with the Department of Transportation, Maritime Administration ("MARAD").  ECF No. 1.

The "innovative partnership" was entered into between Anchorage and MARAD through two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") (cumulatively "the Agreements").  It is these Agreements which Anchorage alleges were breached by MARAD. [1]

---

[1] This case's relevant background factual information, detailed procedural history—including the Government's unsuccessful motion to dismiss, ECF No. 22, and subsequent motion for summary judgment, ECF No. 90, which was denied after a February 2020 "mini-trial" addressing the contentious factual issue of consideration, ECF No. 141—are laid out in this Court's previous opinion, *id.*, and are incorporated by reference as if fully set forth herein.  In addition, in a telephonic status conference following the mini-trial, the Government made clear its intent to argue the other elements of contract formation—intent, offer, acceptance, and authority—at the principal trial, ECF No. 153 at 1.  After requesting briefing on the issues, the

The Court heard a total of 24 witnesses over a nine-day trial held from February 16, 2021 to March 4, 2021, by Zoom, regarding liability and damages.  Anchorage presented its case with fifteen witnesses, the Government with nine.  Notably, the Government did not call any expert witnesses as compared to Anchorage, who called five expert witnesses.

Anchorage's case is premised on evidence and argument that the express terms of the 2003 MOU and Addendum No. 2, as well as the 2011 MOA, required MARAD, to provide technical expertise to oversee, design and construct the Project free of defects.  Because MARAD failed to do so, Anchorage argues MARAD breached its Agreements.  In addition, Anchorage presented evidence and argued that the Government settled claims against it using Anchorage's funds without Anchorage's knowledge or consent, in violation of the Agreements.  Anchorage requests $367,669,257 in damages.

In contrast, the Government countered with its evidence and arguments alleging that Anchorage was the party responsible for managing and executing the Project, thus, MARAD did not breach any duties under the Agreements.  In particular, the Government points to evidence which it concludes proved that the Contracts and contemporaneous circumstances showed that Anchorage, not MARAD, was responsible for the management and control of the Project.  In light of this, argues the Government, it did not breach any duties under the Agreements.  In addition, MARAD argues that a better reading of the Agreements would be that MARAD's duties were only administrative and financial.

Post-trial briefs were timely filed.  In the Government's 163-page post trial brief,[2] the Government raised, for the first time, several new issues.  *See generally* ECF No. 242.  In particular, the Government now argues, in addition to its evidence and arguments presented at trial, that: (1) the 2003 MOU was illegal, *id*. at 53-56; (2) the Contracts "did not define any deliverable" nor did MARAD agree to deliver any "specific item of construction," *id*. at 66; (3) the 2003 MOU's termination provision established that the Government did not have any duties under the 2003 MOU, *id*. at 5, 46, 67, 69, 71, 79, 136; and (4) that judicial estoppel and judicial notice and admission in the U.S. District Court of Alaska[3] ("Alaska case") precluded Anchorage from its current stance on the duties and relationships between Anchorage and the Government.  *Id*. at 64-66, 117-19.  However, on July 20, 2020, this Court specifically held: "counsel is cautioned—any new arguments will be stricken."  ECF No. 158.  Although this Order was in reference to the filing of the parties' memorandum of contentions of fact or law prior to trial, as well as the fact that the Government did not raise these issues at any time during the 7 years of

---

Court prohibited the Government from making contract-formation arguments upon considering that (1) the Government had already admitted that the MOUs in question were contracts; and (2) that the Court's denial of summary judgment encompassed *all issues* raised in the Government's motion, not just that of consideration.  *See id.* at 6.  All three opinions and orders found that the 2003 MOU and 2011 MOA were contracts.  *See* ECF Nos. 22, 141, 153.

[2] Anchorage also filed a lengthy post-trial brief at 153 pages.

[3] In the Alaska case, Anchorage sued ICRC for negligence as a third-party beneficiary to the MARAD-ICRC contract. Ultimately, the case settled between Anchorage and ICRC.

litigation but instead raises the issues in its post-trial brief and in contradiction of the Court's Order, the Court will not allow these new arguments at this late date.  The Court, therefore, **STRIKES** the Government's new arguments.   In addition, in that same order, the Court further warned the Government that the Court would not consider any further argument on contract formation.  *Id*.  Yet, contrary to this Court's ruling, the Government raises yet again, on 8 pages of its post-trial brief, argument regarding contract formation.  The Court will not address these arguments and admonishes the Government for raising the issues in contravention of this Court's order.

Turning now to the case at hand, it is not contested that the bulk of the Project was never completed.[4]  The case, therefore, rests on the terms of the Agreements.  Specifically, the case rests on the roles and responsibilities of the parties as enumerated in the Agreements and whether those duties were breached.

After hearing all the evidence and after careful consideration, the Court finds the Government breached its Agreements with Anchorage.

## I.       Trial Witnesses

Anchorage presented fourteen witnesses in support of its case.  Of the fourteen witnesses, four witnesses were MARAD's employees:  Iris Cooper, Deputy Director of Acquisitions, Wayne Leong, Director, Office of Acquisition & Contracting Officer, and contracting officer at the time of the Project, Michael Carter, Office of the Environment, and Captain Robert Loken, Director of Infrastructure Development and Northwest Gateway and the Contracting Officer Representative at the time of the Project.  Anchorage employees included:  Cheryl Coppe, former Executive Administrator for the Port, Col. George Vakalis, former Anchorage Municipal Manager, Jim Hinkle, former Director of Finance and Administration and Lucinda Mahoney, Commissioner of the Alaska Department of Revenue and former Chief Financial Officer of Anchorage.   Anchorage also called Diana Carlson, Project Manager for ICRC and later Principal-In-Charge.  Expert witnesses included: James Schoonmaker, Doug Playter, Gayle Johnson, P.E., Dr. Timothy D. Stark, P.E., D.GE, F.ASCE,  Patrick McGeehin, and  Ginger Evans, MS, P.E..

In support of its case, the Government called nine witnesses— Captain Scott Davies, transportation specialist in the MARAD Office of Ports and Waterways Planning, Don Norden, a lobbyist who represented Anchorage in connection with the Project, James Lexo, former CEO of ICRC, Diana Carlson, Connie Black, former ICRC Program Manager and deputy to Diana Carlson, Carl Williams, former ICRC Chief Operating Officer, David Cole, engineer who served on the Anchorage Geotechnical Advisory Commission ("GAC") and Roger Bohnert, MARAD Deputy Associate Administrator for the Port from 2007-2015.  The Government also briefly called Ms. Coppe of Anchorage.

---

[4] One area—the dry barge berth area—was the only section of the Project that was successfully completed.  Trial Tr. 3.

II.     **Findings of Fact**

MARAD is a Federal agency and an operating administration of the United States Department of Transportation ("DOT").  The Port of Anchorage, now the Port of Alaska, is an enterprise department of the Municipality of Anchorage.  Stip. ¶ 1.[5]  As a municipal enterprise, the Port pays for its operations costs through its own revenues, rather than the general Anchorage tax base.  Stip. ¶¶ 1-3.  An estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port on an annual basis.  Stip. ¶ 5.  The Port Director is appointed by the Mayor and reports to the Anchorage Municipal Manager.  Trial Tr. 480:24-481-2

In 1999, Anchorage prepared a Master Plan that proposed a phased development to replace deteriorated facilities and meet increasing demands.  Stip. ¶ 6.  The Plan was to guide the Port's growth over a 20-year span. Stip. ¶ 6.  Cheryl Coppe, Port Executive Administrator at the time, stated that "the goal of the Project was to reinvigorate and upgrade the existing infrastructure" and "to accommodate the needs of the military."  Trial Tr. 620:1-9.

 Former Governor William Sheffield took over responsibility for executing the Master Plan as Port Director in May 2001.[6]  DX 863; Stip. ¶ 7.  Previously, Governor Sheffield served as CEO of the Alaska Railroad between 1997 and 2001.  Stip. ¶ 7.  Ms. Coppe also worked at the Alaska Railroad during this time. Trial Tr. 702:22-704-19.  Ms. Coppe followed Governor Sheffield to the Port.  Anchorage also engaged the services of Washington, DC lobbyists, including Don Norden.  Mr. Norden lobbied Congress for funds to pay for the Project.  DX 863.

Ms. Coppe testified that Anchorage was interested in finding a federal lead agency to help with the Project because federal funds had been allocated to the Project. Trial Tr. 624:6-10.  The Project was Federally funded by Congress through MARAD by interagency transfers, pursuant to the following statutory authority: Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2003 (2003 Consolidated Appropriations Act), Pub. L. No. 108-7, 117 Stat. 11, 106, § 626 (Feb. 20, 2003) and Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy For Users (SAFETEA-LU), Pub. L. No. 109-59, 119 Stat. 1144, 1934, § 10205 (August 10, 2005).  Stip. ¶ 106.  From FY2002-FY2010, Congress appropriated a total of $143,066,919.76 for the Project through earmark appropriations to the Department of Defense, the Federal Highway Administration, and the Federal Transit Administration.  Stip. ¶ 105.   In addition, Anchorage paid MARAD a total of $163,400,000 for the Project.  Stip. ¶ 107.  In total, MARAD received a total of $306,466,919.76 in Federal and non-Federal funds for administration of the Project.  Stip. ¶ 104.

Anchorage chose MARAD to be the lead federal agency after rejecting other possibilities. Trial Tr. 625:8-23.  Prior to selecting MARAD as lead federal agency, Ms. Coppe sent a purpose and need statement to MARAD.  Trial Tr. 628:14-16; JX 12.  The purpose and

---

[5] "Stip."  Refers to the Stipulation filed at ECF No. 191.

[6]  Although Governor Sheffield was no longer governor but Port Director during the Project, the parties and witnesses all referred to him as Governor Sheffield and the Court will do so as well.

need statement contained two project design alternatives for the proposed project. Trial Tr. 628:17-23; JX 12.  One design concept mirrored the existing wharf; the other design concept was known as an open cell sheet pile ("OCSP").  Trial Tr. 629:6-20; JX 12.

Sometime thereafter, Ms. Coppe worked with MARAD's Maggie Blum, Associate Administrator, Iris Cooper, Deputy Director of Acquisitions[7] and Tim Roark, Contracting Officer to create the 2003 MOU.  Trial Tr. 630:7-10.  The final 2003 MOU was created by Ms. Coppe of Anchorage and MARAD's employees Ms. Blum and Ms. Cooper.  Trial Tr. 632:8-9; PX 43.  According to Ms. Coppe, the "innovative partnership" was because there were three funding sources that were going to be used to construct an intermodal facility that would also serve the military. Trial Tr. 660:16-661:14.

The 2003 MOU objective was for the parties to "establish working relations and assign responsibilities that leverage the expertise of all parties." PX 43 at 1.  To accomplish this, the 2003 MOU detailed the responsibilities of both MARAD and Anchorage.  In particular, Section IV, of the 2003 MOU, set forth Anchorage's responsibilities:

**Section IV.  MOA [Municipality of Anchorage], PORT OF ANCHORAGE RESPONSIBILITIES:**

1. Provide overall program requirements and direction of Port Expansion to MARAD.
2. Designate primary MOA, Port of Anchorage points of contact for day-to-day direction and management of Port Expansion activities.
3. Review all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD for inclusion in its permanent federal project file.
4. Execute all documentation that will enable MARAD to request interagency funding transfers of all amounts received by other federal agencies through past, present and further annual Congressional Appropriations for Port Expansion.
5. Execute periodic transfers of non-federal amounts for Port Expansion to MARAD.  The MOA, Port of Anchorage shall base transfer amounts on current Port of Anchorage fiscal year Capital Improvement Budget allocation for Port Expansion as approved by the Administration of the MOA and the MOA Assembly.
6. Facilitate periodic transfers, approximately quarterly, of non-federal amounts for Port Expansion to MARAD when MOA, Port of Anchorage does not retain direct financial control of such non-federal amounts allocated under the Port of Anchorage Fiscal Improvement Budget for Port Expansion.

---

[7] In 2004, Ms. Cooper was elevated to Director of Acquisitions. Trial Tr. 45:15-45:18.

7.  Authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary.

PX 43.

MARAD's responsibilities were enumerated as:

**Section V.  MARAD Responsibilities:**

1.  Coordinate with other Federal agencies that receive annual Congressional appropriations for Port Expansion.
2.  Provide specialized technical expertise and input as appropriate to Port Expansion tasks and activities.  Administrative costs to be used for MARAD participation under this project will be 3% of funding received.
3.  Designate primary MARAD points of contact for day-to-day management of Port Expansion activities.
4.  Develop and execute all financial documents as required for the transfer and administration by MARAD of federal and non-federal amounts received for Port Expansion activities.
5.  Accept transfers, approximately quarterly, of the non-federal share for Port Expansion from MOA, Port of Anchorage.  MARAD and MOA, Port of Anchorage shall base transfer amounts on current MOA, Port of Anchorage fiscal year Capital Improvement Budget allocations for Port Expansion as certified by the Administration of the MOA and approved by the Assembly of the MOA.
6.  Expend transfers of the non-federal amounts identified by MOA, Port of Anchorage as bond receipts in first-priority order for Port Expansion activities.  Subsequent to the full expenditure of bond receipts, MARAD shall resume expenditure of other federal and non-federal amounts for Port Expansion activities.
7.  Obligate and disburse funding for Port Expansion project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation pursuant to Port Expansion requirements consistent with contract requirements.

*Id*.  The 2003 MOU was ratified by the Alaska Assembly, Anchorage (Governor Sheffield), and MARAD.  Although he did not testify at trial, Governor Sheffield, was instrumental in this agreement.

In May 2003, MARAD vetted and then contracted with Koniag Services, Inc. ("KSI"), an Alaskan Native corporation, under the Small Business Administration's 8(a) program as prime contractor on the Project.  JX 4.  The contract was a Fixed-Price Indefinite Deliver, Indefinite Quantity ("IDIQ") contract for $210 million.  Stip. ¶ 14.  Thereafter, in February 2004, MARAD,  after vetting, agreed to novate the contract to Integrated Concepts and Research

Corporation ("ICRC") as prime contractor.[8]  Iris Copper and Ms. Coppe both agreed that MARAD did its own investigation before hiring ICRC.   JX 6; Trial Tr. 5-:16-51:1; 838:21-839:14; PX 94; Trial Tr. 74:25-75:18. The contract contained a Statement of Work setting forth the contractor's scope of work.  The Statement of Work included the various services to be provided by ICRC under the contract with MARAD such as quality control, Port Planning and Conceptual Engineering Services, Environmental Documental and Permitting Services, Design Management Services, Construction Management Services, and Contractor Oversight Services. JX 4 at 46-52.  No performance bonds were ever obtained between MARAD and ICRC.  Trial Tr. 183:24-184:4; Stip. ¶ 21.

Ms. Cooper confirmed that the contract contained a provision by which the contractor was required to meet the specifications set forth in the Statement of Work, and to the extent the contractor failed to do so the Government had the right to reject non-confirming work.  Trial Tr. 60:24-61:2.  Mr. Leong, MARAD's contracting officer, also acknowledged that the 2003 MARAD-ICRC  contract required the Contracting Officer or a duly authorized representative to perform inspection and acceptance of supplies and/or services to be provided under the contract. JX 4 at 9; Trial Tr. 145:4-16.

In order to proceed with the Project, MARAD issued Task Orders.  Stip. ¶ 18.  In particular to this case, MARAD issued Task Order 312 to ICRC for design and related services. PX 198.  Ms. Cooper testified as to how the Task Order system worked.  First, Anchorage would identify the requirements that were within the prime contract.  Trial Tr. 77:1-7.  Then, MARAD and the prime contractor would develop a statement of work together with the technical specifications that Anchorage wanted to see constructed.  Trial Tr. 77:13-22.

Diana Carlson had also previously worked with Governor Sheffield at the Alaska Railroad.  Trial Tr. 1806:3-1807-2. At Governor Sheffield's request, Ms. Carlson interviewed at ICRC, and, ICRC hired her as Project Manager. (Later she became Principal-In-Charge.) Trial Tr. 1810-1-17.

After the 2003 MOU was signed, ICRC entered into several subcontracts.  One such subcontract was with Terracon Consultants, Inc. ("Terracon") to conduct a site-specific geotechnical investigation.  Stip. ¶ 25.  Even though ICRC would enter into the subcontracts, Ms. Cooper testified that MARAD would review the qualifications and expertise of all the subcontractors.  Trial Tr. 68:7-10.  Specifically, MARAD's Purchasing Policies required:

> In addition to the following review thresholds, MARAD requires all specifications to be submitted to the COTR for review and approval**. In no instance shall a CONTRACTOR allow work to begin without MARAD's approval of the specification,** unless it is an emergency, or the requirement is specifically waived by the PCO for a mission essential task.

PX 53 at 10 (emphasis in original).

---

[8] For ease the Court will refer to KSI as ICRC throughout.

On March 16, 2004, Terracon issued its Marine Geotechnical Exploration report concluding: "we have determined that the open cell sheet pile wall (OCSP) concept is a feasible alternative," and that "[w]ith soil improvement, it is our opinion that the pile supported deck (PSD) option is feasible." PX 98 at 13. Terracon also stated that "the OCSP option will prove most economical to construction and potentially have lower life cycle costs than the pile-supported deck." *Id*.

On August 3, 2004, ICRC and Terracon entered into a second subcontract for Geotechnical Engineering and Investigation Support Services for the Project. Stip. ¶ 26. On September 24, 2004 Terracon issued its Global Stability Analysis Report which evaluated conceptual designs for an OCSP and a pile-supported structure in all areas of the Port. PX 115; Stip. ¶ 27. Terracon concluded that "[b]ased upon the stability analysis, we have determined that the OCSP and PSD options are feasible for the construction of the port," and that "[w]e recommend that the OCSP structures be constructed from the landside and that the dredging planned beneath the structures and partial placement of engineered fill be conducted prior to the driving of sheet piles." PX 115

In 2005, MARAD and ICRC conducted an Environmental Assessment ("EA") studying design alternatives. Stip. ¶ 24; JX 12. The EA ultimately concluded that the OCSP was the preferred design and MARAD selected the OCSP structure for the Project. JX 12; PX 193; Trial Tr. 341:10-18. MARAD's Director of the Office of the Environment, Michael Carter, assisted in preparing the Environmental Assessment. Trial Tr. 307:18-307:25. Mr. Carter acknowledged that MARAD relied on Terracon's geotechnical analysis in selecting the design. Trial Tr. 309:20-310:5.

Then, in February 2006, MARAD and Anchorage amended the 2003 MOU,[9] to include that MARAD was to accept the work via execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects." PX 188.

In March 2006, MARAD issued Task Order 312 to ICRC for design and related services for the North Waterfront Expansion. Stip. ¶ 28.

In June 2006 ICRC contracted with PND Engineers for design services under Task Order 312. The subcontracts were approved by MARAD. Stip. ¶ 31; PX 206. During the months of June/July 2006, PND subcontracted with GeoEngineers, Inc. and VECO, also for design services. Stip. ¶ 32.

Construction work at the Project was broken into four distinct areas: North Backlands, Dry Barge Berth, Wet Barge Berth and North Extension. Under Task Order 404 and 405, ICRC contracted with Alaska Interstate Construction Company, LLC ("AIC") to perform the work.

---

[9] This was the second time that the 2003 MOU was amended. In June 2003, the MOU was amended for the first time. PX 64.

In March 2008, MARAD issued Task Order 414 for construction of the OCSP bulkhead at the Dry Barge Berth, Wet Barge Berth, and North Extension. Stip. ¶ 45. The sheet piles are vertically arranged steel structures that act as a horizontally-tied membrane to retain soil. Stip. ¶50. The Bulkhead features a vertical flat sheet pile anchor wall (tail wall) to restrain a curved flat sheet pile arch face. *Id*. Fill is then placed in the open cells creating additional Port property. *Id*. A key feature of the OCSP design for the Project was a construction dike that acts as a working platform for installation of the bulkhead wall from the landside. Stip. ¶ 51. The construction of the OCSP-related parts of the Project, as designed, were to take place in phases including the construction of the Dry and Wet Barge Berths and the North Extension. Stip. ¶ 52.

PND and GeoEngineers produced a Geotechnical Analysis Report. ICRC, PND, Terracon, and GeoEngineers also met with U.S. Army Corps of Engineers ("USACE") to review the Geotechnical report, and USACE affirmed finding of compliance with Phase II[10] permit design coordination with respect to the initial planned phase of construction, North Waterfront Project. Stip. ¶ 41.

On March 19, 2008, ICRC contracted with Quality Asphalt Paving ("QAP") for sheet pile driving under Task Order 414. Stip. ¶ 45. Thereafter, QAP contracted with MKB Constructors ("MKB") to conduct sheet pile installation. PX 321. MKB commenced in-water pile driving in the Dry Barge Berth on July 15, 2008. In 2008, QAP and MKB began sheet pile installation in the Wet Barge Berth, and experienced difficulties as soon as work on the Wet Barge Berth commenced. Stip. ¶ 58.

In July 2008, MARAD and ICRC entered into a second contract to continue performance re: designing and building. PX 357. This MARAD-ICRC contract was similar to the 2003 MARAD-ICRC agreement.

QAP/MKB achieved substantial completion of the Dry Barge Berth in July 2009, and it was accepted as complete by Anchorage. Stip. ¶ 57. However, after the 2009 construction season, QAP's contract "descoped" and terminated because of deficient performance.

In 2010, ICRC contracted with West Construction Inc. ("West") to remedy problems found in the Wet Barge Berth and North Extension. West found numerous defects. In December 2010, ICRC demanded that QAP and MKB correct their deficient work. Stip. ¶ 82. Mr. Leong testified that QAP responded asserting that it was design flaws that caused the problems in the north waterfront extension. Trial Tr. 218:13-16. ICRC later revoked its demand to QAP/MKB to repair and/or remove damaged and non-conforming work on the Project. Stip. ¶ 83.

In November 2010, MARAD refused to pay ICRC citing poor performance. After this, Governor Sheffield wrote to MARAD for it to pursue claims against ICRC for the failed Project. PX 622. Specifically, MARAD's Roger Bohnert wrote that "[o]n several occasions the

---

[10] The Project was to be completed in two phases.

Governor talked about being "made whole," and MARAD should "go after ICRC" for restitution.  PX 622.

On August 30, 2011, MARAD executed an inter-agency agreement with USACE to conduct a detailed investigation.  USACE awarded a contract to CH2M Hill to perform a Suitability Study.  Stip. ¶ 88.  The Suitability Study was a detailed engineering analysis to evaluate whether the bulkhead design was suitable for use at the Project as well as investigated and documented defective construction work at the Project.  Stip. ¶ 88; Trial Tr. 860:8-22.

Then, on September 29, 2011, MARAD hired AECOM Services Inc. to perform a Root Cause Analysis to find out who was responsible for the defects.  Stip. ¶ 87; PX 712.  The Suitability Study was to run parallel with the AECOM root cause analysis.  However, AECOM was terminated without completing the contract and after being paid approximately $500,000.  Trial Tr. 587:4-588:5.

Because of the continual problems with construction, the parties informally created a Project Oversight and Management Organization ("POMO").  Trial Tr. 430:20-432:3).  Thereafter, in November 2011, Anchorage and MARAD entered into the 2011 MOA.  Stip. ¶ 86; JX 34.  The 2011 Agreement reaffirmed the Parties' existing obligations and formally established the POMO.  JX 34.  The objective of the 2011 MOA was for the parties to "establish a working relationship and assign responsibilities to the respective parties."  *Id*. at 1.  Section III. C, of the 2011 MOA, articulated that: "[t]he PIEP is a major transportation infrastructure project for the Federal Government and the MOA/POA that must be delivered in a manner that captures the public's trust and confidence in the government's ability to effectively and efficiently deliver a quality product."  *Id*.

Section IV of the 2011 MOA formally established the POMO.  The POMO was to "provide overall executive leadership, vision, policy, strategic objectives, and priorities for the Project."  *Id*. at 2.  The POMO consisted of Project executives, members, and advisors.  *Id*. at 3.  The executive members consisted of the Mayor of Anchorage and MARAD Administrator.  *Id*.  The executive duties were to address "major scope, schedule, and budget changes. . . ."  *Id*.  Members of the POMO consisted of the Municipal Manager, Port Director and MARAD associate.  *Id*.

Anchorage's responsibilities, found in Section V of the 2011 MOA, were as follows:

**A.  MOA/POA Responsibilities:**

1. Develop an up-to-date Port Master Plan.
2. Execute all documentation that will enable MarAd to request interagency funding transfers of all amounts received by other federal agencies through past, present, and future annual Congressional Appropriations for Port Expansion.
3. Execute transfers of non-federal amounts for the Project to MarAd in a timely manner.

10

4. Authorize all Project funding maintained by MarAd for federal project oversight, program management, study, environmental analysis, engineering, design, construction or rehabilitation as required.

5. Transfer to MarAd, on a quarterly basis 3% of all funding received under this project to cover MarAd's cost related to the project until May 12, 2012.

6. Assume no later than May 31, 2021, through itself or its designee, acquisition and contract administration for the design and construction of the project.

7. Since the authorities of the parties involved acknowledge the requisite complexities inherent in the interaction of federal and local municipal law, the Port Director shall not invoke Anchorage Municipal Code Title 11.050.50 as it relates to this agreement between the parties.

8. Coordinate with the Port Users and keep them apprised of the progress of the Project and seek their input as necessary.

*Id*. at 4.

Pursuant to Section V. B. MARAD's responsibilities included:

1. To the extent required by law, administer any funds provided for the federal share, and any funds provided for the non-federal share, for the Project.

2. Facilitate through its Memorandum of Agreement with the U.S. Army Corps of Engineers Alaska District and the Economy Act 31 U.S C. §1535, the transfer of project funds as necessary for a Technical evaluation of the preferred alternative's Open Cell Sheet Pile foundation system and other project related expenses including, but not limited to, dredging, project design and constructability analysis, and such other expenses as are reasonably incurred.

3. As Federal Partner to the MOA, provide subject matter expertise in support of the Project, including, but not limited to, areas such as project oversight and management, compliance with federal environmental laws and regulations, including the approval of proper permitting, coordination with other federal agencies, and the management and transfer of funding for the Project.

4. Provide an on-site MarAd representative for day-to-day direction and management of activities on the Project and coordination with MarAd headquarters.

5. Develop and execute any financial documents as required forth transfer and administration by MarAd of federal and non-federal amounts received for Project activities.

6. Provide to the MOA Project records developed by MarAd or its designees.

7. Pursuant to the Contract Disputes Act, 41 U.S.C. §§7001- 7013, administer claims submitted by MarAd contractors and coordinate and

cooperate with the MOA/POA in affirmative and defense of claims consistent with federal contract law.

8. Through itself or its designee, provide acquisition, contract administration, construction, design and quality assurance service for the Project until May 31, 2012.

*Id*. at 5-6.

On Sept 19, 2011, ICRC submitted a claim to MARAD seeking payment of fees for its role as program manager. Stip. ¶ 95. In July 2012, MARAD and Anchorage entered into a Joint Defense Agreement. Stip. ¶ 98. On Sept 28, 2012, MARAD executed a settlement with ICRC in the amount of $11.3 million paid to ICRC. Stip. ¶99. MARAD also released all its claims against ICRC. Anchorage was not involved in the settlement nor did it consent. Stip. ¶ 99.

On March 31, 2012, CH2M Hill issued a draft Suitability Study. Stip. ¶ 89. On Feb 14, 2013, CH2M Hill issued a final suitability study finding that the design and construction were defective. JX 41; Stip. ¶ 90. CH2M Hill also concluded that the Wet Barge Berth and North Extension must be reconstructed using a suitable design. *Id*. Douglas Playter, the Senior Project Manager at CH2M Hill who oversaw the Suitability Study, testified that CH2M Hill found that the factors of safety for the OCSP bulkhead constructed in the Wet Barge Berth and North Extension are far below industry standard. Trial Tr. 878:10-879:6. He further testified that the OCSP bulkhead could collapse. Trial Tr. 900:2-12. Specifically, Mr. Playter testified that the OCSP bulkhead must be removed and stabilized because it is a safety hazard and will fail. Trial Tr. 906:7-24; 1016:24-1017:7.

In the end, neither the Wet Barge Berth nor the North Extension were completed. Stip. ¶ 91.

Now, Anchorage is undergoing a Port Modernization Project ("Modernization Project") designed to rebuild the entire Port infrastructure. Mr. Playter, of CH2M Hill, testified with regard to the Modernization Project. The Modernization Project will be built in phases because Anchorage does not have enough money to build it all at once and the Port needs to remain open during construction. Trial Tr. 900:17-901:25. Furthermore, the North Extension of the Port needs to be stabilized for seismic and static reasons. Trial Tr. 902:1-7.

CH2M Hill is the program manager. CH2M Hill hired Kiewit-Manson as the design-build contractor. Kiewit-Manson then hired AECOM who preprepared a preliminary design for the North Extension areas. CH2Mill oversees the work of Kiewit-Manson and indirectly ACECOM. Trial Tr. 902:8-16.

After CH2M Hill hired Kiewit-Manson as the design builder, AECOM, as Kiewit's subcontractor, prepared a 35% design estimate ("AECOM 35% Design Estimate"). PX 973. AECOM first reviewed the North Extension area and evaluated a variety of designs for slopes and soil mixing processes. AECOM came up with what is referred to as the AECOM 35% Design for North Extension stabilization Step 1. Step 1 was to be done as soon as possible and a second effort, known as Step 2 would be done after the construction of key facilities necessary to

provide services to Anchorage after a major earthquake.  Trial Tr. 920:2-921:2, 1016:4-1019:1.
Step 1 removes the highest part of the OCSP structure to allow ships to dock at Terminal 3
more safely.  It also is a result of the need to replace essential facilities in the Port prior to a
major earthquake.  *Id.*  In Step 2, Anchorage plans to come back and remove the balance of the
structure.  The OCSP structure will have to be removed all the way to the Dry Barge Berth.  Trial
Tr. 920:2-921:13. Therefore, the entire OCSP structure must be removed and then stabilized
because it is a safety hazard and will fail. Trial Tr. 906:7-24; 1016:24-1017:7. This plan will not
use any open cell sheet piles nor does it use a closed cell structure.  Trial Tr. 922:1-923:5. The
35% design includes a detailed design narrative, a constructability review, and a detailed
schedule.  Trial Tr. 923:6-929:13; PX 972, 974.  Although the AECOM 35% North Extension
stabilization design was only for Step 1, the damages sought by Anchorage are an estimate for
both Steps 1 and 2.   Trial Tr. 1377:20-1381:6.  Mr. Schoonmaker, retired former member of
Moffat & Nichols, testified as an expert in estimating the demolition of the existing North
Extension.  He concluded that the design chosen by Anchorage for removing the defective
structure and stabilizing the area was $186,607,000.00.  Trial Tr. 1322:9-13.  His probability of
accuracy goal for his estimate was a range of minus 20 to plus 30.  *Id*.

### III.    Plain Meaning of the Agreements

#### A.    MARAD was Obligated to Provide Federal Project Oversight, Design, and Construction and to Deliver a Defect Free Project pursuant to the 2003 MOU and Addendum No. 2 to the 2003 MOU

Although this Court has already ruled that "[i]t is clear from the 2003 MOU that
MARAD had a duty to oversee, design and construct the Project, ECF No. 141 at 13, MARAD
now argues a different position, that the "innovative partnership" required Anchorage to direct
and manage the Project on a day-to -day basis, while MARAD's duties were only administrative
and "almost entirely financial." ECF No. 242 at 58, 71, 95.  In support, the Government argues
that the contemporaneous circumstances surrounding the Project show that Anchorage, led by
former Alaska Governor William Sheffield, was in charge of the Project and that MARAD was
only there "to implement the Port's decisions through any necessary contract actions."  ECF No.
242 at 2-3.  Therefore, the Government argues that the Court cannot give the plain meaning to
the Agreements.  ECF No. 242 at 1.  Instead, "the language of a contract must be given that
meaning that would be derived from the contract by a reasonably intelligent person acquainted
with the contemporaneous circumstances." *W. States Const. Co. v. United States*, 26 Cl. Ct. 818,
825 (1992) (quoting *Hol–Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388 (1965)) "Thus, to
interpret disputed contract terms, 'the context and intention [of the contracting parties] are more
meaningful than the dictionary definition.'"  *Metric Constructors, Inc. v. Nat'l Aeronautics and
Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999).  *See also P.J. Maffei Bldg., Wrecking Corp. v.
United States*, 732 F.2d 913, 917 (Fed. Cir. 1984) (instructing that a proper technique of contract
interpretation is for the Court to place itself "into the shoes" of the parties).

In contrast, Anchorage argues that the 2003 MOU expressly delineates the parties' roles
and responsibilities.  ECF No. 241 at 6-7; ECF No. 248 at 9-10.  Those duties and
responsibilities, argues Anchorage, established a duty for MARAD to provide a completed item

of construction and to provide design construction and project management services, free of defects.

The Court agrees that the 2003 MOU expressly delineates the parties' roles and responsibilities.[11]  Even so, the Court also finds that the contemporaneous evidence shows that the MARAD was obligated to provide Federal project oversight, design, and construction, and for MARAD to deliver a completed defect free project.

Both parties acknowledge that "[c]ontract interpretation begins with the language of the written agreement." *Bell/Heery v. United States*, 739 F.3d 1324, 1331 (Fed. Cir. 2014) (quoting *Coast Fed. Bank FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc)) (quotation omitted).  ECF No. 242 at 56; ECF No. 248 at 9-10.  In addition, the parties agree that the Court "may not insert a term into the contract that simply is not there."  *Pete Vicari Gen. Contractor, Inc. v. United States*, 51 Fed. Cl. 161, 169 (2001); s*ee also Pacificorp Cap., Inc. v. United States*, 25 Cl. Ct. 707, 716 n.8, 717 n.9 (1992) (finding no duty related to a contract term that was purposefully removed from the contract at issue).  *Id.*  Courts, therefore, are bound by terms of agreement and may not render the terms of an agreement meaningless.

Relying on Section IV of the 2003, Anchorage argues and presented evidence that its responsibilities were to provide to MARAD: (1) overall program requirements and direction of Port Expansion; (2) designate primary MOA, Port of Anchorage points of contact for day-to-day direction and management of Port Expansion activities;  (3) review all plans, specifications, and status reports submitted by the primary contractor and its subcontractors before submission to MARAD for inclusion in its permanent federal project file; and (4) to "authorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction, or rehabilitation as necessary."  PX 43.  In support of its position, Anchorage called Ms. Coppe and Col. Vakalis of Anchorage as well as Ms. Copper, Mr. Leong and Captain Loken of MARAD.

Ms. Coppe, as a drafter of the 2003 MOU, testified as to Anchorage's responsibilities.  For instance, she testified that Anchorage's main responsibility and obligation was to "tell MARAD what [Anchorage] wanted because [Anchorage was] the owner of the Project."  Trial Tr. 636:13-15.  She further testified that the day-to-day direction Anchorage was giving to MARAD referred to the Port's day-to-day operations.  Trial Tr. 637:1-4.  This meant that Anchorage was required to provide constant communication to the prime contractor about the Port activities in order for the port to continue to operate.  Trial Tr. 637:4-13.  Day-to-day direction did not relate to design and construction.  Trial Tr. 637:14-17.  Nor did Anchorage have staffing to oversee design and construction; that was "why [Anchorage] had the contract for port expansion."  Trial Tr. 637:18-21.

With regard to the review of "all plans, specifications and status reports" Ms. Coppe testified that the provision was added to ensure that Anchorage was getting what it wanted.  Trial Tr. 638:9-15.  The review was not intended for the Port to provide engineering oversight.  Trial

---

[11] In light of the reasoning set forth, the Court need not address Anchorage's arguments regarding extrinsic evidence as well as trade customs and usage.

Tr. 638:16-18.  However, as part of the review oversight, Anchorage reviewed Task Orders before they were sent to MARAD for payment.  Trial Tr. 638:23.  Review was required, according to Ms. Coppe, to make sure that "what [Anchorage] was asking for was being provided before the actual activity proceeded . . . before money was being spent."  Trial Tr. 638:23-639:4.

MARAD employees, Wayne Leong and Iris Cooper further solidified Anchorage's responsibilities.  Mr. Leong, the Contracting Officer and Director of Acquisition for MARAD during 2002-2012, Trial Tr. 123:5-15, 124:4-6, testified that Anchorage was responsible for securing project funding and communicating project needs.  Trial Tr. 133:17-21.  Ms. Cooper, testified regarding the relationship between the parties, specifically indicating that Anchorage would have "defin[ed] what it wanted out of the project" as project owner.   Trial Tr. 46:20-22, 47:1-3.

George Vakalis, the former Anchorage Municipal Manager and Anchorage's corporate designee, testified in both his personal capacity and as a corporate designee.  He testified that in his position he was tasked with understanding the parties' roles and responsibilities.  Trial Tr. 415:4-7.  As such, he testified that Anchorage's role was to ensure that the Port was operational through the Project, and to review Task Orders to ensure there was no conflict between tasks that were being performed and the normal operations at the Port.  Trial Tr. 417:5-12.

Section V of the 2003 MOU set forth MARAD's responsibilities with regard to the Project.  In particular, Section V.2 required MARAD to "[p]rovide specialized technical expertise and input as appropriate to Port Expansion activities."  PX 43.  Section IV.7 of the MOU provided that Anchorage was to "'[a]uthorize all Port Expansion funding maintained by MARAD for federal project oversight, program management, study, environmental analysis, engineering, design, construction or rehabilitation as necessary."  PX 43.  As consideration, MARAD was to be paid 3% off all funding received for the Project to cover administrative costs.  PX 43, Section V.2.  Addendum No. 2 of the 2003 MOU, required that MARAD deliver a completed project, free of defects.  PX 188.

 With respect to Section V.2, Ms. Coppe testified that MARAD was to provide overall oversight and oversee contract administration, and with regard to other areas of technical expertise, MARAD would execute contracts as provided in the phrase "provide specialized technical expertise and input as appropriate to Port expansion tasks and activities."  Trial Tr. 643:21-644:11. With regard to V.7 of the MOU regarding obligating and disbursing funding for project oversight and other tasks, she testified that "obligate" is another way to describe "contracting," and that MARAD would be disbursing funds to a prime contractor for specific activities.  Trial Tr. 645:5-25.  She defined "federal project oversight" as it related to MARAD's responsibilities, as meaning "a lead federal agency."   Trial Tr. 641:13-20.  In addition, she testified that Federal project oversight, meant that the lead federal agency was responsible for managing the overall project, managing the contractors MARAD had hired, and delivering a Port to Anchorage.  Trial Tr. 831:3-:22.

Col. Vakalis concurred with Ms. Coppe's testimony.  Simply put, he testified that MARAD was to provide expertise as it pertained to the Project, provide oversight and

management of the design and construction and manage all funds.   Trial Tr. 415:9-18.   In addition, Col. Vakalis testified that he understood that the Project was to be accepted by MARAD and Anchorage, and per Addendum No. 2 to the 2003 MOU, the Project was to be free of defects.   Trial Tr. 415:19-416:16.

Ms. Cooper, of MARAD, further testified that MARAD as the lead federal agency on the Project "was responsible for managing the contract with the contractor who did the actual port construction."   Trial Tr. 47:4-15.   She further testified that MARAD would carry out its obligations on the Project through the award of contracts.   In her words, MARAD was "responsible for contract management," Trial Tr. 47:16-23, and as such the deliverable that MARAD was to manage and ultimately deliver to the Port was a newly expanded Port.   Trial Tr. 47:24-48:3.

Mr. Leong testified that not only was MARAD's role on the Project to manage and administer funds, but it was also responsible for contracting and procuring goods and services, including procuring the technical aspects of the Project, project oversight, and quality assurance. Trial Tr. 133:23-25, 147:19-148:1.   In spite of the difficulties installing the sheet pile cells, Mr. Leong wrote emails suggesting that pile driving continue nonetheless due to the short construction season in Alaska. Trial Tr. 214:24-215:2.   Mr. Leong agreed that the direction for the contractor to either continue or stop performance could only come from MARAD.   Trial Tr. 214:24-215:5. Captain Robert Loken, of MARAD, echoed Mr. Leong's testimony with regard to MARAD's responsibilities. Trial Tr. 561:5-9.   He further articulated that Anchorage's role was to secure funding and to communicate the Project phasing needs.   Trial Tr. 561:1-4.

Nevertheless, the Government points to contemporaneous evidence to support its position that Anchorage was in charge of the Project and MARAD's only duty was administrative and financial.   The Government relies heavily on the Port's representations to the Anchorage Assembly[12] regarding the Project.   ECF No. 242 at 18-21.   For example, in one of the first Assembly presentations, Ms. Coppe provided a detailed explanation of MARAD's roles on the project: "MARAD has three roles as the lead agency for this project. . . . [T]hey act as the funding agency, they act as the project oversight agency, and they act as a contract administration agency."   JX 3 at 45:16-20; Trial Tr. 795:15-25.[13]

The Government further points to evidence that showed that in order for the Assembly to better understand and approve the partnership between MARAD and Anchorage, Ms. Cooper testified that she understood that Ms. Coppe wanted a letter stating that the Port "was in charge of the program and project."   Trial Tr. 111:6-112:14.   MARAD provided the letter from its Administrator, William Shubert, which stated: "[The project] represents a new way for the Government to work with private industry in a teaming arrangement.   As such, the programmatic and technical controls reside with the Port."   JX 7 at 704; DX 726.   Indeed, Ms. Coppe confirmed that this letter was clarifying for the Assembly the agreement that had been reached

---

[12] The Alaska Assembly was required to ratify the 2003 MOU.   The Assembly met four times before ratifying the 2003 MOU.   Stip. ¶ 10.

[13] Ms. Coppe used the same language to describe MARAD's roles when discussing the 2003 MOU with the Port's lobbyists as well.   DX 727.

between Anchorage and MARAD regarding the project structure.  DX 185 at 4:4-16; Tr. 810:22-811:7, 812:15-813:2. And as part of the ratification packet, the letter was referenced.  JX 7 at 704; JX 8 at 15:69-70.

However, this evidence does not persuade the Court that the roles and responsibilities of the 2003 MOU were not clear nor that the contemporaneous evidence changed the plain meaning of the 2003 MOU.  In fact, Ms. Coppe also testified as to the reasoning for the Assembly's concerns and the need for the letter from MARAD.  Her testimony was clear, the Assembly was concerned that "the Federal Government would essentially come in and control – take over control of the port . . .  and [Anchorage] would have no say in how things were done, [and] how they were built.  Trial Tr. 657:18-25.  She further testified that her statement to the Assembly as to "all control of who owns it, who builds it. . . is here," here meaning Anchorage, was intended to express to the Assembly that Anchorage remained the owner of the Project, that Anchorage determined what it wanted, and that Anchorage wanted to make clear that the Federal Government could not dictate what gets built.  JX 3 at 49; Trial Tr. 664:11-665:7. Of course, Anchorage would present its case for the Project in its best light as the approval of the Assembly was needed for the Project to go forward.  It was essentially a sales pitch.  Thus, the representations to the Assembly were merely to assure the Assembly that Anchorage would retain control of the Port, not change the meaning of the roles and responsibilities of the MOU.

The Government further directs the Court to its evidence presented at trial which it suggests proved that "the parties' contemporaneous understanding [was that] Anchorage would be managing and executing the project on the ground."  ECF No. 242 at 59.  The Government relies on the fact that Governor Sheffield was interested in moving the Project forward by using the SBA 8(a) program to issue a sole-source contract to ICRC.  *Id.*  (citing Trial Tr. 1626:5-1627:5, 1627:19-23, 1628:20-1629:22; 728:19-24.  It is the Government's position that because Governor Sheffield was excited to use the sole-source program, it was at his insistence that MARAD contract with ICRC.  First, the Court notes that MARAD's use of the SBA8(a) program to award the sole-source contract is irrelevant to the issue of duties.  Moreover, the enabling legislature was silent as to the competition procedure MARAD was to implement in fulfilling its contract obligations, and so MARAD was free to do as it chose.  Second, Ms. Copper, who personally oversaw the contract for MARAD, stated that the decision to award the contract to ICRC was MARAD's decision.  Trial Tr. 50:14-51:1. Indeed, there was plenty of testimony that Governor Sheffield was extremely involved in the Project; however, Governor Sheffield did not have the ultimate authority to determine whether to award a contract to a particular party.  Trial Tr. 118:12-119-1.

The Court does not ignore the fact that Governor Sheffield had some authority under the 2003 MOU.  The 2003 MOU spelled out those authorities and responsibilities. The testimony was clear that he was briefed continually as to the progress of the Project as well as attended daily meetings.  The evidence from ICRC employees, Diana Carlson and Connie Black, clearly showed that Governor Sheffield pushed the team hard.[14]   In addition, the testimony was clear

---

[14] The evidence showed that both Ms. Carlson and Ms. Black worked tirelessly on the Project.

that all the Task Orders had to be approved by Governor Sheffield before payment by MARAD. Even if it is true, as the Government contends, that Governor Sheffield in essence bullied MARAD and ICRC into making their decisions,[15] this fact is irrelevant. Rather, the question is: whether MARAD was compelled to follow the dictates of Governor Sheffield by the 2003 MOU. From the description of responsibilities in the MOU, MARAD held the legal right to refuse Governor Sheffield. And even though Governor Sheffield was briefed daily with regard to all aspects of the Project, and reviewed all the Task Orders, that does not mean he had control of the Project. Just because MARAD and ICRC accommodated Governor Sheffield, that was their choice, not the requirement under the 2003 MOU or the contracts between MARAD and ICRC.

Yet, the Government continues to argue that the terms of the MARAD-ICRC contracts support its interpretation of the 2003 MOU. The Court does not agree. The terms of the ICRC contract simply reflect a typical federal procurement contract and the services to be provided by the prime contractor to the Government – and nothing more. In fact, Ms. Cooper and Captain Davies, both MARAD employees, agreed that Anchorage did not have any rights under the contract. Trial Tr. 79:24-80:4, 1523:18-24.

And finally, the Government alleges that the 2003 MOU and Addendum No. 2 were not fully integrated. ECF No. 242 at 82. To be clear, the Court finds that the 2003 MOU was a fully integrated agreement. An agreement is not completely integrated if the writing "omits a consistent additional agreed term which is (a) agreed to for separate consideration, or (b) such a term as in the circumstances might naturally be omitted from the writing." *Grand Acadian, Inc. v. United States*, 87 Fed. Cl. 193, 209 (2009) (citing Restatement (Second) of Contracts § 216(2) (1981)). As Anchorage correctly points out, there was no evidence introduced at trial that the 2003 MOU omitted additional terms that were agreed to for separate consideration. Although the Government cites to documents from Ms. Coppe suggesting that the Project would be further defined through "subsequent procurement documents," ECF No. 242 at 82, and such documents were executed by MARAD following the 2003 MOU, such documents do not negate or render obsolete the duties MARAD owed Anchorage. Every witness confirmed that MARAD's role under the 2003 MOU was to build the Port – which is exactly what MARAD attempted to do. This is clear evidence of MARAD's duty to deliver the Project to Anchorage. Conversely, had the Project responsibilities belonged to Anchorage, it would have been Anchorage's duty to solicit and separately contract for those services. But it did not. It was MARAD who held those contracts, including the rights, remedies, and obligations under those contracts to procure those services. Furthermore, Addendum No. 2 was clear, MARAD was to accept the work upon the execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to

---

[15] In fact, the Government argues that the ICRC witnesses were the more credible witnesses with regard to knowing how they were being managed, who they were reporting to on a day-to-day basis, and who was making the relevant decisions on the project. ECF No. 242 at 87. The Government also argues that these employees are more credible because they are neutral third parties. *Id.* The Court agrees that the ICRC employees were credible witnesses who all worked hard to make the Project a success. However, it does not change the legal contractual relationship between MARAD and ICRC.

specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects."   PX 188.

Contemporaneous evidence can help interpret a contract, in contrast to supplying terms in an unintegrated contract.  Consequently, for the reasons set forth above, the Court finds that the plain text of the 2003 MOU and Addendum No. 2, interpreted in light of contemporaneous evidence of the parties' understanding, established a duty for MARAD to provide a complete item of construction or to provide design construction and project management services, free of defects.

## B.  The Plain Meaning of the 2011 MOA further Confirms MARAD's Obligation to Oversee, Design, and Construct the Project

The Government now advances a perplexing argument that "the 2011 MOA disproves Anchorage's argument that MARAD was responsible for executing the Project under the 2003 MOU." ECF No. 242 at 83.  In making this argument, MARAD compares the language found in the 2003 MOU related to "funding and administering" the Project, with the 2011 MOA phrase "deliver[ing] a quality product." *Id.*   In comparing the two, the Government argues that it was never responsible for the Project under the 2003 MOU.  Instead, according to the Government, it received these "new duties" under the 2011 Agreement, including duties to provide project management, construction, design, and quality assurance services. *Id.*  The Court disagrees. This interpretation does not comport with the plain language of the Agreements and the witness testimony confirming that plain language.

In making its argument, the Government ignores MARAD's responsibilities that were enumerated in the 2003 MOU.  These responsibilities never changed with the 2011 MOA.  In fact, similar to 2003 MOU, the objective of the 2011 MOA was for the parties to "establish a working relationship and assign responsibilities to the respective parties." JX 34 at 1.  In conformance with Addendum No. 2 of the 2003 MOU requiring that the Project be free from defects, Section III. C, of the 2011 MOA, articulated that: "[t]he PIEP is a major transportation infrastructure project for the Federal Government and the MOA/POA that must be delivered in a manner that captures the public's trust and confidence in the government's ability to effectively and efficiently deliver a quality product." *Id.*  Moreover, whereas the 2003 MOU specifically provided that MARAD was to "obligate and disburse" funds for design and construction services, and to provide "federal project oversight," PX 4, the 2011 MOA provided that MARAD "provide subject matter expertise," and "administer funds."  JX 24 at 5.  Clearly, the responsibilities cannot be classified as "new duties" as suggested by the Government.

Furthermore, contrary to the Government's assertion that Col. Vakalis agreed that the 2011 MOA "substantially changed the parties' roles on the project," ECF No. 242 at 84 (citing Trial Tr. 480:18-481:9), Col. Vakalis's testimony at this citation made no such claim.  Instead, the testimony elicited by the Government referred to the POMO's creation and who would have a seat at the decision-making table.  What the Court finds more persuasive is Col. Vakalis's testimony that the 2011 MOA did not alter or amend the goals and responsibilities related to oversight of the Project and that it only reaffirmed the parties' existing obligations as well as formally establishing the POMO.  Trial Tr. 434:13-25.

And finally, the Government argues that "Anchorage misinterprets the nature of the responsibilities transferred to the Port at the expiration of the 2011 MOA on May 31, 2012." ECF No. 242 at 84. Specifically, the Government argues that Anchorage's interpretation that the 2011 MOA transferred design and construction responsibility to Anchorage is incorrect. Instead, according to the Government, the transfer of duties to Anchorage was only for the "acquisition and contract administration" for the Project. The Court disagrees. The 2011 MOA clearly states that Anchorage will "[a]ssume, not later than May 31, 2012, through itself or its designee, acquisition and contract administration *for the design and construction of the Project*." JX 34 at 4 (emphasis added). Clearly, the plain reading of the clause shows that MARAD was in control of contracting for, and administration of, design and construction of the Project from its inception through May 31, 2012, after which Anchorage would take over. Stated another way, if Anchorage was always responsible for the administration of the design and construction work for the Project, why would Anchorage have to assume these responsibilities upon expiration of the 2011 MOA? It is clear that the design and construction of the Project rested with MARAD up until May 31, 2012.

For these reasons, the Court finds that the plain reading of the 2011 MOA confirms MARAD's obligation to oversee, design, and construct the Project.

## IV.     The MARAD-ICRC Contract and Subsequent Breach by MARAD

It is a basic premise of contract law that, absent excusable grounds, a party to a contract is obligated to fulfill the duties it undertook. *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 776 (2005). Furthermore, a contractor is responsible for the performance failures of its subcontractors absent a showing of impossibility or other excusable grounds." *Id*.

Both Anchorage and the Government agree that MARAD's role on the Project included administrative duties. ECF No. 242 at 95; ECF No. 248 at 26. To that end, the Government contends that its "roles on the project were entirely administrative, intended to simply implement the Port's decisions through the ICRC contract." ECF No. 242 at 95. Even if true, Anchorage argues, the Government "fails to define what is meant by 'administrative.'" ECF No. 248 at 26. As provided by Anchorage, the Court agrees that the only reasonable interpretation can and must be "administrative" as defined in the government procurement context since MARAD was the contracting agency. *See* NASH & CIBINIC, ADMINISTRATION OF GOVERNMENT CONTRACTS at 1 ("The broad goals of contract administration are to ensure that the government obtains the needed work on time and at the level of quality called for by the contract and that the contractor receives proper compensation. This will often involve ensuring that both parties fulfill their contractual obligations.").

Accordingly, as the Court has already found, MARAD's obligation was to procure a completed, defect-free Project pursuant to the 2003 MOU and, notably, Addendum No. 2. The 2003 MOU further provided, and the Court found that MARAD was required to execute contracts for the design and construction of the Project. The Court further found that the 2011 MOA further confirmed MARAD's obligation to oversee, design and construct the Project.

A. **Contractual Arrangement**

MARAD's contractual arrangement is clearly shown by the contractual chart prepared by MARAD:



PX 193.

Now, however, instead of relying on this chart, the Government asserts that the MARAD-ICRC- contract was like a "three-sided partnership." ECF No. 242 at 22. This means, according to the Government, that the Contract between MARAD-ICRC was actually a contract between MARAD-ICRC-Anchorage. *Id*. The Government contends that this three-sided partnership resulted in Anchorage being "responsible for substantively directing and managing ICRC's work, while MARAD administered the contract and ensured compliance with all legal requirements." *Id*. In support, the Government points to Ms. Black's testimony that ICRC used the organization chart that was sent to Ms. Coppe in early 2003 which depicted a triangle of communications among the Port, MARAD, and ICRC. DX173; Trial Tr. 1674:1-9, 1674:25-1675:5, 1675:17-1676:9. With this backdrop, MARAD "deferred" the day-to-day operations to Governor Sheffield. ECF No. 242 at 116. In doing do, the Government claims that Governor Sheffield was in charge of the project and as such he was responsible for the Project failure. Failure occurred because Governor Sheffield: (1) picked the design, (2) refused to pay for an independent review, and (3) failed to prevent construction deficiencies. Thus, Governor Sheffield's action prove that Anchorage was the party responsible for directing and managing ICRC, not MARAD which resulted in the Project's failure. ECF No. 242 at 97-113. The Court finds that the evidence says otherwise.

The evidence was clear that even though Governor Sheffield preferred the OCPS design,[16] MARAD selected the design after its contractors, ICRC and Terracon, performed feasibility analysis of two different design alternative.  Trial Tr. 1979:10-1985:11.  In particular, the Government's witness, Diana Carlson, of ICRC, testified on cross-examination that the design selection process and feasibility analysis began in 2003 and continued through 2005. Trial Tr. 1979:10-1985:11.  Ms. Carlson also admitted that Terracon, hired by ICRC and MARAD as the geotechnical engineer for the Project, recommended the use of the OCSP design, touted it as more economical to construct and stated that it would have lower life cycle costs over a more traditional pile-supported deck.  Trial Tr. 1981:10-23.  Ms. Carlson also acknowledged that it would make sense for an owner to want a design that was more economical and easier to construct.  Trial Tr. 1981:24-1982:2.   Ms. Carlson's testimony was clear that ". . . a threshold decision [was] reached by MARAD, after consultation with the Port, [  ] to use the OCSP technology in the design work for the Project."[17]  JX 42 at ¶ 21; Trial Tr. 1989:10.

The Government further claims "that both ICRC and MARAD recommended that an independent review be performed, but that Gov. Sheffield refused to pay for it."  ECF No. 242 at 97.  However, the evidence is clear, that Governor Sheffield did approve funding for an independent review.  *See, e.g.*, DX 614.  Yet, the Government directs the Court's attention to the testimony of Ms. Carlson and hearsay statements made by unknown speakers during a GAC[18] meeting.  ECF No. 242 at 101-03; DX 775; Trial Tr. 2192:20-2193:17.  The Government also relies on letters sent to the GAC; however, the evidence showed that it was not Mr. Sheffield who wrote the letters to the GAC regarding the independent review process but Ms. Carlson.

Furthermore, the testimony elicited at trial from Ms. Carlson indicated that throughout the Project there had been an adequate independent review process.  Trial Tr. 2014:3-10.  In fact, Ms. Carlson's letters to the GAC, which were written on behalf of Governor Sheffield, included her stated position that the independent review process was completed.  Trial Tr. 2014:20-2027:21.

---

[16] The Government cites to several documents to support its allegations that Governor. Sheffield is responsible for the OCSP design.  However, none of these documents support this proposition.  *See* ECF No. *242* at 100; DX 594 (specification for request for proposal including "OCSP design is the preferred method"), DX 608 (ICRC Request for Proposal for preliminary engineering and design services, DX 609 (letters from companies informing ICRC that no proposal would be forthcoming due to OCSP design preference), DX 614 (Task order for design services) and PX 959 (ICRC's answers to interrogatories in the Alaska case).

[17] Ms. Carlson also testified that design options were being considered by Anchorage as early as 2001.   But this does not change the fact that Anchorage did not hold the contract between MARAD and ICRC and the fact that the testimony reflected that MARAD chose the OCSP design in consultation with Anchorage.  Again, MARAD held the contracts and as such decided the who and what of each contract.

[18] The Geotechnical Advisory Commission ("GAC") is a nine-member commission appointed for three-year terms by the Anchorage Mayor and confirmed by the Anchorage Assembly.  Stip. ¶ 22.  In May 2008, the Project design team presented to the GAC regarding the Project's final design and final geotechnical analysis. This included a presentation by Terracon regarding its pre-design studies and reviews for the Project.  Stip. ¶ 23.

The Government's argument that MARAD, ICRC, and PND recommended that the OCSP installation begin with a small test section, but that recommendation was denied by Governor Sheffield is not true.  ECF No. 242 at 35.  Rather the evidence at trial showed that MARAD chose to eliminate the one-year trial.  *See* JX 42; DX 973; Trial Tr. 2081:3-20.

With regard to the Government's assertion that Governor Sheffield failed to prevent construction deficiencies, the Government relies on an April 9, 2009 ICRC email to MARAD recommending terminating QAP's subcontract.  PX 413.  In this email ICRC recommends terminating QAP's subcontract for convenience due to the Beluga whales and the environmental restrictions.  According to the Government however, the email should have put Anchorage on notice of the difficult pile driving conditions which ended in the construction defects.  The email clearly shows that the Government's contention is without merit.  Even so, Anchorage was not a party to this subcontract.  MARAD hired ICRC who in turn hired QAP.  Anchorage had no authority to terminate the QAP subcontract or to direct ICRC to do so.  Nor could Anchorage terminate the ICRC contract or direct ICRC to take action due to the contractual relationship between MARAD – ICRC – QAP.  Trial Tr. 539:23-542:16. Of course, Anchorage could make recommendations to MARAD and ICRC, but again, Anchorage had no legal authority to terminate any of these contracts.

Moreover, MARAD knew that the design and construction defects were the responsibility of ICRC and its contractors.  In its November 2010 award fee determination issued to ICRC pursuant to the 2008 MARAD-ICRC Contract, MARAD stated:

> ICRC's inability to properly manage their subcontractors is a major weakness. Given the substantial amount of subcontract work being performed for both design and construction of the project, substantial cost overruns have taken place, in addition to scheduled delays. This has had a major impact on the critical path of the program. ICRC and their subcontractors have been late in meeting design milestones, and designs have required numerous revisions, which have resulted in cost escalation.

PX 619.  MARAD further stated:

> The contractor has implemented some project activities successfully, but has failed to implement the project as a whole. ICRC core activity for the PIEP is to build the bulkhead structure that will create new real estate and serve as the foundation for the container cranes. ICRC has failed to implement and manage the bulkhead construction, negatively impacting the program performance. ICRC has put corrective action plans in place to mitigate the impact, but the project remains behind schedule and over budget.

*Id*.

Likewise, the suitability study done by CH2M Hill also concluded that both the design and construction of the Wet Barge Berth and North Extension were defective and had to be

reconstructed using a suitable design.  PX  917.  MARAD does not dispute the findings in the CH2M Hill Suitability Study, nor has MARAD offered an expert to rebut these findings.

The Court notes again, Anchorage was not a party to the MARAD-ICRC contract. MARAD contracted with ICRC to procure a completed, defect-free Project.  As the Federal contracting entity, pursuant to its contract administration obligations, MARAD was required to ensure that it obtained the needed work on time and at a level of quality called for by the contracts. To accomplish this, MARAD was to administer federal procurement contracts; specifically, MARAD contracted with ICRC to procure a completed, defect-free Project. Because MARAD failed to do so, the Court finds that MARAD breached its contractual obligations to Anchorage

The Court, therefore, finds that MARAD was responsible for the defective construction of the Project and as such breached the 2003 MOU.[19]

## B.  MARAD Failed to Enforce its Contractual Remedies or to Administer Funds Properly

With regard to the Anchorage's contention that MARAD failed to enforce its contractual remedies or to administer its funds properly in breach of the 2003 MOU, the Court agrees with Anchorage.   Pursuant to Addendum No. 2 to the 2003 MOU, MARAD was required to accept all work on the Project before it could be approved as completed, at which time MARAD would convey to Anchorage a completed Port free of defects.  PX 188.  The addendum specified that MARAD was to accept the work via execution of a Certificate of Completion by MARAD's prime contractor "attesting to the prime contractor's inspection of the work, and certifying the work was completed according to specifications and all applicable requirements, including but not limited to customary industry standards, and is free from material defects."[20]  *Id.*

It is undisputed that, through the 2003 and 2008 MARAD-ICRC contracts, MARAD had contractual remedies that it could assert against ICRC to complete the work.  In fact, the 2003 MARAD-ICRC Contract contained the following remedies:

> • Contractor performance shall be evaluated by the contracting officer throughout the life of the contract. Contractor product and services, which do not meet the minimum quality standards specified in attachment J-1, statement of work, and elsewhere in this contract, may be subject to correction. These corrections may include but are not limited to the following: (1) re-performance by the contractor, as directed by the contracting officer; (2) re-performance by the government, with

---

[19] The Government also alleges that the Project was not fully funded.  The Court finds that it was as a total of $306,466,919.76 in Federal and non-Federal funds for administration of the Project.  Stip. ¶ 104.  The original contract to ICRC was for $207 million.  Thus, when the Project began, it was fully funded.

[20] It is undisputed that neither MARAD not its prime contractor, ICRC, ever delivered a certificate of acceptance for Anchorage to sign, nor is there any evidence to that effect.

re-performance costs charged to the contractor; (3) termination for default.

• The contractor shall also be responsible for all damages to persons or property that occur as a result of the contractor's fault or negligence.

JX 4.

The 2008 MARAD-ICRC contract also contained remedies including:

• Contractor performance shall be evaluated by the Contracting Officer throughout the life of the contract. Contractor product and services, which do not meet the minimum quality standards specified in attachment J-1, statement of work, and elsewhere in this contract, may be subject to correction. These corrections may include but are not limited to the following: (1) re-performance by the contractor, as directed by the contracting officer; (2) re-performance by the government, with re-performance costs charged to the contractor; (3) termination for default.

• The contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence.

• The contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements. If the contractor does not promptly replace or correct rejected work, the Government may (1) by contract or otherwise, replace or correct the work and charge the cost to the contractor; or (2) terminate for default the contractor's right to proceed.

• FAR 52.228-16 ("The contractor shall furnish a performance bond for the protection of the Government…. The contractor shall furnish all executed bonds…before starting work.").

PX 357. MARAD's witnesses confirmed that MARAD never enforced these remedies. For instance, MARAD's Captain Scott Davies testified that, when the construction defects became apparent, Anchorage expected MARAD to enforce its rights against the contractors. Trial Tr. 1521:25-1522:13. The evidence showed that Captain Davies further testified that Anchorage had no way to enforce rights and thus Anchorage relied on MARAD to enforce these remedies. Trial Tr. 1523:18-1523:24. MARAD never did.

The Government further asserts that it disclaimed its design liability to Anchorage through a 2005 contract Modification 12 to its Federal procurement contract with ICRC. ECF No. 242 at 75; DX 588. However, turning to Modification 12 the Court notes that the Modification relates to MARAD's contract with ICRC, not Anchorage. Again, Anchorage was not a party to the MARAD-ICRC contract. JX 4. But, the Court does note that the modification includes the statement that: "neither Anchorage nor MARAD are taking professional responsibility for the design." *Id*. This, claims the Government, alleviates it from liability. However, Mr. Leong explained that this clause is standard language in any agreement to procure

architect-engineering services.   Trial Tr. 255:20-256:11. In fact, his testimony revealed: "Yes. That's pretty standard government contracting – construction contracting.  If we're hiring professional engineers, you know, we rely on their -- on their professional expertise."  Trial Tr. 256.  Thus, it does not mean that MARAD, who contracted with ICRC to procure design services, would not have liability to Anchorage for the design if it ultimately turned out to be defective, as it did here.

Moreover, the evidence at trial demonstrated that MARAD understood and agreed that it undertook design liability in the event the OCSP design failed.  In a March 5, 2007 Memo authored by Diana Carlson to Mr. Leong, Ms. Carlson provides MARAD with information on additional insurance to protect the project.  JX 15; Trial Tr. 190:12-190:14. Specifically, Ms. Carlson stated:

> This insurance is required due to the design-build component of the project.
> Without including this policy requirement, **ICRC and the government
> may be ultimately responsible for design errors and omissions** in the
> event the contractor's designer fails to procure adequate coverage and a loss
> occurs.

JX 15; Trial Tr.  191:11-191(emphasis added).

MARAD also tries to argue that it is relieved from liability because the language in the "Background" section of the Statement of Work provides that deliverables would be provided to Anchorage, not to MARAD.   However, as this Court has already held, when MARAD awarded the procurement contract to ICRC, MARAD was procuring those services from ICRC pursuant to its obligations to Anchorage.  That was the entire purpose of that procurement.  Although Anchorage was to be the end user and recipient of the Project, nothing in the ICRC contract allows MARAD to avoid its responsibility to properly administer that contract or to avoid its obligations to Anchorage.

And finally, MARAD admits that it had contract administration responsibilities, and that this includes administration of funds.  ECF No. 242 at 126, 145.  At trial, the evidence showed that MARAD continued to pay ICRC after the defective work was discovered.  Trial Tr. 558:9-12.  Specifically, in May 2009, MARAD was advised by ICRC that there were issues with installation of the sheet pile, including potential damage to the sheet pile interlocks and the need for a physical inspection.  PX 431.  A physical inspection did not happen at this time; instead MARAD waited until late 2009.  Pursuant to its 2008 contract with ICRC, not only was MARAD required to inspect the Project but it was also required to enforce the provisions of the contract requiring ICRC to correct defective work.  PX 357.  Instead, MARAD continued to pay ICRC for work defectively performed in 2009 and 2010.  In doing so, the Court finds that MARAD failed to administer the Project funds properly and thus, breached the 2003 MOU.

### C.  The Government's Breach of the 2011 MOA

The 2011 MOA obligates MARAD to defend against claims as well as pursue affirmative claims on MOA's behalf.  MARAD specifically agreed that it would "[p]ursuant to Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7001-7013 [sic], administer claims submitted by MARAD contractors and coordinate and cooperate with the MOA/POA in affirmative and defense of claims consistent with federal contract law." JX 34 at 5.  The evidence showed that MARAD settled a claim with ICRC without Anchorage's input and with Anchorage's money.  See ECF No. (summary judgment order and opinion).  However, in support of its actions, the Government argues that it did not need Anchorage's input, as "the 2011 MOA was not extended according to its terms."  ECF No. 242 at 122.  This is true, the 2011 MOA expired in May 2011 and the claims were paid on September 28, 2012.  ECF No. 241 at 96.

However, even though MARAD settled the claims with ICRC after the expiration of the 2011 MOA, in this case, the parties stipulated that ICRC began filing its claims in early 2011, during the existence of the 2003 MOU.  Stip. ¶¶ 92-96.  Furthermore, when the parties executed the 2011 Agreement, Col Vakalis testified that it was, in part, to agree on how the parties would address ICRC's claims.  Trial Tr. 439:9-439:20. In light of that, the parties included in the 2011 Agreement the provision whereby MARAD would defend against claims as well as pursue affirmative claims on Anchorage's behalf.[21]  *See* JX 34 at 5.  This is also well-established by case law.  *See Seven Resorts, Inc. v. United States*, 112 Fed. Cl. 745, 785 (2013) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991) ("[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied.").  "A provision that survives the expiration of a contract's term, therefore, may obligate a party to perform under the provision even after the contract in which it is contained has expired."  *Seven Resorts, Inc.*, 112 Fed. Cl. at 785–86.  For these reasons, the Court finds that MARAD breached the 2011 MOA when it settled the claim.[22]

---

[21] The provision was intended to address ICRC's certified pass-through claim (on behalf of QAP/MKB) to MARAD filed several months prior to execution of the 2011 Agreement.  Stip. ¶¶ 94-96; Trial Tr. 439:9:20.

[22] In light of this ruling, the Court need not address whether the Government breached its duty of good faith and fair dealing.

### V.      Conclusion

For the reasons set forth above the Court hereby finds the Government breached its Agreements with Anchorage.

The Court will enter a separate opinion on damages.

**IT IS SO ORDERED.**

<u>s/Edward J. Damich</u>
EDWARD J. DAMICH
Senior Judge