# In the United States Court of Federal Claims

No. 14-166C
(Filed: February 24, 2022)

```
*************************************
                                    *
ANCHORAGE, A MUNICIPAL              *
CORPORATION,                        *    Trial, Damages, Expectancy Damages
                                    *
            Plaintiff,              *
                                    *
      v.                            *
                                    *
THE UNITED STATES,                  *
                                    *
            Defendant.              *
                                    *
*************************************
```

### OPINION AND ORDER

**DAMICH,** Senior Judge

     Trial was held in this matter from February 16, 2021 through March 4, 2021.  Post-trial briefs were filed by Plaintiff, Anchorage, A Municipal Corporation ("Anchorage") on May 4, 2021, ECF No. 241, and the Defendant, the United States ("the Government") on June 3, 2021, ECF No. 242.  Anchorage filed its reply on August 2, 2021.  ECF No. 248.  On September 21, 2021, the Court ordered Anchorage to respond to its questions regarding new arguments by the Government.  ECF No. 249.  Anchorage complied.  ECF No. 252.

     On December 9, 2021, this Court issued its Opinion and Order on liability, finding that the Government breached its contracts to build a defective free port structure ("Project").  ECF No. 253.  The parties, Anchorage and the Department of Transportation, Maritime Administration ("MARAD") entered two agreements–a 2003 Memorandum of Understanding ("2003 MOU") and a 2011 Memorandum of Agreement ("2011 MOA") to build the Project.  *Id*.  It is these Agreements the Court found MARAD had breached.  *Id*.

     After the Court issued its Opinion and Order on liability, the Court issued an order requesting the parties clarify and provide the supporting trial evidence for certain damages calculations.  ECF No. 254.  The parties complied.  ECF Nos. 255, 256.  This damages' opinion

and order incorporates the trial testimony and evidence, post-trial briefs, and responses to the Court order.[1]

Anchorage seeks two categories of damages as a result of the failed Project: (1) costs spent by Anchorage for the Government to design and construct the defective open cell sheet pile ("OCSP") system and related costs ("impairment damages"); and (2) costs to remove and stabilize the OCSP system ("future costs"). Specifically, Anchorage argues and has presented evidence that it suffered damages related to the lost costs/value due to the defective design and construction in the amount of $180,839,809. ECF No. 255. To remove and stabilize the OCSP System, Anchorage advances it will cost it $186,607,000. ECF No. 241 at 102; ECF No. 255. Thus, the total amount of damages sought by Anchorage for breach of contract is $367,446,809. This amount, according to Anchorage, will not put it in a better position than it would have had the breach not occurred but will put Anchorage in the same position it would have been but for the breach. ECF No. 248 at 40.

The Government objects to these amounts. Relying on this Court's order, ECF No. 254, requesting clarification and direction to supporting evidence, the Government argues that these discrepancies "demonstrates the unreliability of the damages calculation." ECF No. 256 at 1. The Government further argues that Anchorage's damages calculations are inaccurate because the damages calculations: (1) do not include a deduction for Alaska state funds that the Government claims have been already reimbursed to Anchorage (2) do not account for the value Anchorage received in the project; (3) cannot include future costs because Anchorage has already rejected the removal project that it claims will occur; and (4) that the portion of Federal funds was never recorded as an asset or an advance on Anchorage's financial statements. *Id*. at 1-2; *see also* ECF No. 242 at 131-34, 137-39.

For the reasons set forth below, the Court finds that Anchorage has proven both its impairment damages and future costs in the amount of $367,446,809.

I.  **Findings of Fact**[2]

The Port of Anchorage, now the Port of Alaska, is an enterprise department of the Municipality of Anchorage. Stip. ¶ 1.[3] The Port is a critical national seaport with an estimated 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port on an annual basis. Stip. ¶ 4. The Port is subject to some of the highest tidal fluctuations in the United States and second highest in North America. Trial Tr. 1046:17-1047:2. The City of Anchorage is also known to be very seismically active. Trial Tr. 1019:5-1019:11.

Relevant to damages, Anchorage called four expert witnesses at trial. Specific to this opinion and order, Anchorage's expert witnesses included: James Schoonmaker and Patrick

---

[1] The Court notes that there a calculation discrepancies—these are discussed in detail *infra*.

[2] A full recitation of the findings of fact can be found at ECF No. 253.

[3] "Stip." refers to the stipulation of facts filed jointly by the parties. ECF No. 191.

McGeehin. Anchorage also called Doug Playter, Project Manager of CH2M Hill, and Lucinda Mahoney, Commissioner of the Alaska Department of Revenue and former Chief Financial Officer of Anchorage. The Government did not call any expert witnesses.

### A. Impairment Damages Testimony and Evidence

For impairment cost calculations, Mr. McGeehin, of FTI Consulting, was qualified at trial as an expert in forensic accounting and damages calculation. Trial Tr. 1164:4-17. He testified that $180,839,809 was the amount incurred attributed to the unusable section of the OCSP system. Trial 1183:5-23. Mr. McGeehin apportioned the money that was spent on the usable and unusable assets. Trial Tr. 1165:1-19. He reviewed where the money was spent on the Project taking into consideration the Federal funds, Alaska grant funds, Anchorage funds, Task Orders, Bohnet spreadsheets,[4] deposition transcripts, the views of the Government's expert witness, Mr. Benes (who did not testify), settlements between the Government and Integrated Concepts and Research Corporation ("ICRC"), as well as Anchorage's settlement with ICRC. Trial Tr. 1165:20-1167:12. From these Mr. McGeehin calculated that $298,790,000 was spent on the Project. Trial Tr. 116:3-9; 1168:22-23. He did not include the $3 million administrative fees paid to the Government. Trial Tr. 1268:18-1170:6; *see also* ECF No. 153.

Then, Mr. McGeehin calculated certain areas that were deemed usable and excluded them from his calculations. PDX3. The North Backlands, South Backlands, and Tidewater Road were usable space. *Id*. For the unusable portion of the OCSP structures, he calculated an area of 2435 lineal feet. The total OCSP structures amounted to 2905 lineal feet. *Id*. The unusable portion (2435 lineal feet) constituted 83.82% of the OCSP lineal feet of the 2905 lineal feet. *Id*. Mr. MeGeehin applied the 83.23% against the OCSP-Construction Task Orders, OCSP Fill amount, and OCSP general sites. *Id.* Other Task Orders and amounts spent on the Project were listed at 100%—worked performed in 2009/2010 by West Construction Company ("West") to temporarily stabilize the structure—line items OCSP Remediation Task Order and OCSP Remediation General Site, the Corps of Engineers suitability study, and the Government-ICRC settlement. Anchorage was also able to sell unused sheet pile and gravel, which Mr. McGeehin added as a credit.

The following summarizes the impairment damages:

---

[4] On February 18-19, 2020, the Court held a "min-trial" on the issue of consideration. The Government presented Mr. Bohnet, a MARAD employee, as its witness regarding funds. As part of his responsibilities, and in preparation of trial, he was tasked with preparing spreadsheets tallying all the funds appropriated, transferred, and expended in connection with the project. The purpose of the spreadsheets was to show where every dollar, federal and nonfederal, was expended. *See* ECF No. 141.

**SUMMARY OF DAMAGES**

| Categories/Percentages | Total Unusable 2,435 LF |
|---|---|
| *83.82%* | |
| OCSP-Construction Task Orders | $126,264,016 |
| OCSP Fill Materials Amounts | $5,032,192 |
| OCSP General Site Amounts | $20,260,567 |
| **Subtotal** | **$151,556,775** |
| | |
| *Percentages 100%* | |
| Corps of Engineers (Suitability Study), Task 8 | $3,397,900 |
| ICRC Settlement Amounts with MarAd | $11,279,059 |
| OCSP Remediation Task Orders | $32,421,056 |
| OCSP Remediation General Site | $5,002,955 |
| Credit for Sales of Sheet Pile and Gravel | ($3,467,936) |
| **Subtotal** | **$48,633,034** |
| | |
| Subtotal | $200,189,809 |
| Less: Settlements from Prior Litigation | ($19,350,000) |
| **Total** | **$ 180,839,809**[5] |

The Government did not challenge this evidence by expert witness. Nor did the Government challenge the Task Order amounts calculated by Mr. McGeehin in its post-trial brief. *See* ECF No. 242. However, at trial, Government counsel attempted to discredit Mr. McGeehin's allocation of costs with regard to Task Orders by challenging Mr. McGeehin's knowledge of the Task Orders as related to the Project. Specifically, Government counsel asked:

> BY MR. WISSER:
>
> Q. Mr. McGeehin, you recall you had highlighted these red areas as, I guess, the scope of what you were looking at in terms of costs associated with those areas; is that accurate?
>
> A. Yes.
>
> Q. Okay. And do you know how those particular areas of the project relate to the task order structure?

---

[5] In his chart, PDX 3, Mr. McGeehin has added the subtotals incorrectly. The first category he totals as $151,556,774, which is off by $1.00. It should be $151,556,775. The 100% subtotal is also recorded as $48,633,033, also off by $1.00. It should be $48,633.034. This lends to the total impairment damages as being off by a total of $2.00 on his chart, as well as Plaintiff's briefs. The summary provided above has the correct calculations as well as throughout this Opinion and Order.

> A. Well, they -- they were task orders -- as I mentioned before, there are task orders that were specifically identified as OCSP task orders. And some of those were based upon times.
>
> So, for example, I forget the year, but I think by 2008, a lot of task orders now, because by 2006, the north backlands had been completed, and I think it was 2007 or so, the south backlands, so there was a time element of the identification.
>
> But it's not always that pure because as I said, within a particular task order, you could be doing work both in the bulkhead area and in the – in the, for example, south backlands and north backlands, but I think I gave two examples of task order 406 and 414.
>
> So it's -- it's not, unfortunately, simply a matter of one is definitely all of this and one is definitely all of that.
>
> Q. Well, do you recall that the amount you allocated from 406 to 414 was only for materials, purchases, fill and steel?
>
> A. I think the amount that got – that originally was -- was -- 406 was originally allocated all to north backlands and considered usable. The amount that we then allocated over into the OCSP system was more than just a fill and steel. It included some traffic control, it included some filter rock, it included some armor rock.
>
> So there were a series of items that were billed from AIC[6] up through ICRC that we looked at on the final change order on that project to see how those had been designated. Were they designated as OCSP? Or were they designated by -- as south backlands?
>
> Q. So you referenced that you would review the final change order to make that determination?
>
> A. Sometimes, yes. So, for example, in – in that particular -- in that particular one, which is the only big one that we really made a move on, there was a Change Order 8 that summarized everything for that project.
>
> And the contractor, AIC, identified in that change order where the different costs related to among the three areas that I just identified. We -- we used that as our framework for identifying from the work done by AIC up through ICRC, how that should be apportioned to the task orders.
>
> Q. And I guess that's what I'm trying to get a clear picture of, because you say that the work should have been apportioned to the open cell sheet pile, and

---

[6] Alaska Interstate Construction Company, LLC ("AIC") was hired by ICRC and performed work on the North Backlands. AIC placed armor rock on the slip slope for tidal protection. Stip. §§ 43-44. The armor rock slipped into the footprint into the future footprint of the Wet Barge Berth and was not removed prior to the installation of the sheet piles. *Id*.

> that's what I'm trying to figure out, is what – what basis are you using to define the open cell sheet pile work, whether it's based on a specific task order or something else?
>
> A. Yes, so the -- the -- for example, in that particular area, the identification for the OCSP was done by subcontractor AIC. So they -- they identified their -- what they called their south backlands, north backlands, and there were certain change orders where you had to try to marry that back to one of the areas and -- and the area generally called the dry barge berth, meaning the -- the bulkhead.

Trial Tr. 1194:15-1197:9. This small sample shows that Mr. McGeehin understood the Project and allocated costs appropriately. For instance, Mr. McGeehin was clear that he reviewed the task orders together with the change orders. In doing so, he evaluated what costs should be allocated to the OCSP system and, if any, what costs should be allocated to the usable areas. To accomplish this, at times he had to "marry" back change orders to task orders for various areas, as well as determine what materials should be included in what he considered the usable portion of the Project versus the unusable portion of the Project. The Government did not challenge the costs as related to the Bohnet spreadsheets, Trial Tr. 1201:10-16, nor did the Government challenge the ICRC settlement amount, Trial Tr. 1201:17-20, which were used in Mr. McGeehin's damages' calculation.

With regard to the linear amount used in making his calculations, again, the Government did not challenge the calculation in its brief. However, during trial, the Government again attempted to discredit Mr. McGeehin's usable vs. unusable assumption. Trial Tr. 1200:12-1201:9. On cross examination Mr. McGeehin stated that he was not offering any opinion about the usability of any structure from a technical, functional basis but instead was relying on the Suitability Study which stated which areas of the project are considered unusable. Trial Tr. 1200:18-1201:9. The Suitability Study was a detailed engineering analysis to evaluate whether the bulkhead design was suitable for use at the Project as well as investigated and documented defective construction work at the Project. Stip. ¶ 88; Trial Tr. 860:8-22. CH2M Hill issued its final Suitability Study finding that the design and construction were defective, JX 41; Stip. ¶ 90. The study also concluded that the Wet Barge Berth and North Extension were defective and had to be reconstructed using a suitable design. PX 917. These findings were not disputed by the Government, nor did the Government offer an expert to rebut these findings. This study, therefore, supports the Court's conclusion that Mr. McGeehin's calculations are accurate.

### B. Future Costs Damages Testimony and Evidence

With regard to future costs, CH2M Hill, the program manager for the Port Modernization Project ("Modernization Project"), Douglas Playter, the Senior Project Manager at CH2M Hill, who oversaw the Suitability Study, testified that CH2M Hill found that the factors of safety for the OCSP bulkhead constructed in the Wet Barge Berth and North Extension are below industry standard and that the OCSP bulkhead could collapse, is a safety hazard, and must be removed

and stabilized as it will fail.  He further testified that neither the Wet Barge Berth nor the North Extension were completed.  Trial Tr. 1016:4-1019.

Anchorage is currently undergoing a Modernization Project designed to rebuild the entire Port infrastructure.  Mr. Playter testified that the Modernization Project will be built in phases because Anchorage does not have enough money to build it all at once and the Port needs to remain open during construction.  CH2M Hill hired Kiewit-Manson as the design-build contractor for the Modernization Project.  Kiewit-Manson hired AECOM to prepare a preliminary design for the North Extension areas.  CH2M Hill currently oversees the work of Kiewit-Manson and indirectly AECOM.

AECOM prepared a 35% design estimate ("AECOM 35% Design Estimate").  To accomplish the design estimate, AECOM first reviewed the North Extension area and evaluated a variety of designs for slopes and soil mixing processes.  AECOM broke the project into 2 steps.  PX 973.

Step 1 was called:  35% Design for North Extension Stabilization Step 1. This was to be done as soon as possible and a second effort, known as Step 2, will be done after the construction of key facilities necessary to provide services.  Step 1 removes the highest part of the OCSP structure to allow ships to dock at Terminal 3 more safely.  It also is a result of the need to replace essential facilities in the Port prior to a major earthquake.  *Id.*  The 35% design includes a detailed design narrative, a constructability review, and a detailed schedule.  Although the AECOM 35% North Extension stabilization design was only for Step 1, the damages sought by Anchorage are an estimate for both Steps 1 and 2.  In Step 2, Anchorage plans to come back and remove the balance of the structure.  The OCSP structure will have to be removed all the way to the Dry Barge Berth.  This plan will not use any open cell sheet piles nor does it use a closed cell structure.  *Id.*

Mr. Schoonmaker testified as an expert in estimating the cost of the demolition of the existing North Extension, removal costs of the defective structure, and the cost of stabilizing the area.  His experience included bidding on projects in Cook Inlet, Alaska.  With this experience and in preparing this estimate, Mr. Schoonmaker visited the job site, and reviewed all the construction design documents.  Opining from his experience, and reviewing PX 973 (AECOM's drawings), PX 972 (the design narrative), PX 974 (milestone constructability review), PX 975(Kiewit-Manson's Schedule for Step 1), PX 976 (AECOM's advanced design narrative justified the one to six sea floor slope, the use of an armored revetment, and the need for soil improvements), Trial Tr. 13637-24, Mr. Schoonmaker arrived at $186,700,00, for costs related to demolition, removal, and stabilization of the area.  He testified that his probability of accuracy goal for his estimate was a range of minus 20 to plus 30.  In particular, Mr. Schoonmaker detailed the following estimate of costs:

> **(1) Site Preparation and Management -** $477,000.00, for site preparation and management, including clearing of the site prior to construction and the environmental controls required for siltation and the maintenance throughout the Project.  Trial Tr. 1371:1-10.

**(2) Demolition and Excavation -** $42,776,000.00, for the complete demolition of the existing sheet piles structures and the excavation of the backfill materials. Trial Tr. 1371:11-14.

**(3) Place Slope Protection -** $15,727,000.00, for riprap slope protection that is to be placed on the dredge-prepared slopes after it is completed. Trial Tr. 1371:15-1372:1.

**(4) Material Disposal -** $13,376,000.00, for removing from the job site the excavated dredge materials, dredge disposal and the removal to the scrap yard of steel materials from the bulkhead. Trial Tr. 1372:2-10.

**(5) Asphalt Paving -** $135,000.00, to remove a 20 foot-wide strip of paving a couple of hundred feet long. Trial Tr. 1372:11-1.

**(6) Soil Mixing -** $36,536,000.00, for enhancing and strengthening soil properties by injecting a cement blend in with the existing soil. Trial Tr. 1373:18-1373.

**(7) Mobilization-** $11,626,000.00, for bringing the material, equipment, personnel, and any construction fixtures that may be necessary for the Project. Trial Tr. 1373:4-19.

**(8) Engineering Design and Geotech -** $7,516,000.00, for completing the design including borings and lab analysis of soils. Trial Tr. 1373:20-1374:2.

**(9) General and Administrative -** $19,032,000.00, is the contractor's overhead costs, including supervision, maintenance, and costs not assigned to direct efforts listed above. It also includes an office complex, bonds, and insurance. Trial Tr. 1374:8-18.

**(10) Corporate Overhead and Profit -** $29,440,000.00, is calculated at a 20% rate due to the challenging restrictions related to marine mammals and unknown conditions with respect to wind, weather and seismic activity and risk. Trial Tr. 1374:19-1375:11.

**(11) Environmental and Permitting Consultant -** $775,000.00, third-party environmental and permitting consultant. Trial Tr.    1375:21-1376:1.

**(12) PM/CM Consultant -** $9,191,000.00, for a third-party consultant during the design phase to manage that process and to handle the procurement of the construction contractor and the construction of the Project. Trial Tr. 1376:2-15.

The Government did not challenge this evidence by expert witness. The Government's cross-examination did not successfully counter these numbers either. Instead, the cross-examination merely focused on whether the two-step process is cost effective, the effect on the whale population, and where the equipment might come from to complete the Project. Trial Tr. 1388-1392. The cross-examination did nothing to dissuade the Court from finding Mr. Schoonmaker's calculations accurate.

## II. Discussion

After proving a breach of contract, as Anchorage has done, Anchorage is now entitled to recover damages which were proximately caused by the defendant's breaches, were reasonably foreseeable, and were proven with sufficient certainty to permit the finder of fact to reasonably calculate, with reasonable certainty, the amount. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1324-25 (Fed. Cir. 2002); *Cal. Fed. Bank FSB v. United States*, 245 F.3d 1342, 1349-50 (Fed. Cir. 2001); *Bluebonnet Savings Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001).

Here, Anchorage argues that it suffered damages related to the lost costs/value due to the defective design and construction of the Wet Barge Berth and North Extension as well as future costs that will be needed to remove and stabilize the defective structure. ECF No. 241 at 102; ECF No. 255. In order to recoup these costs, Anchorage proposes two separate theories for recovery: expectancy or reliance. For the reasons set forth below, the Court awards damages to Anchorage under the expectancy theory of damages.[7]

### A. Expectancy Damages

Expectancy damages are intended to "place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1374 (Fed. Cir. 2005) (citing *San Carlos Irrigation and Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)). The "general principle is that all losses, however described, are recoverable." *Indiana Michigan*, 422 F.3d at 1373 (quoting Restatement (Second) of Contracts, § 350, cmt. b). Expectation damages cover both costs to mitigate damages and incidental costs. *Citizens Federal Bank v. United States*, 474 F.3d 1314 (Fed. Cir. 2007) (bank entitled to recover costs related to mitigating damages); *Boston Edison Company v. United States*, 64 Fed. Cl. 167 (2005) (incidental damages include "costs incurred in a reasonable effort, whether successful or not, to avoid loss").

In addition, a plaintiff must also prove that both the "magnitude and type of damages were foreseeable" at the time of contract formation. *Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1378 (Fed. Cir. 2001). "Loss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know." *Id.* (quoting Restatement (Second) of Contracts § 351(2)). "The mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351, cmt. a.

The Government argues that Anchorage cannot claim expectancy damages because the 2003 MOU did not define any expectancy interest.[8] ECF No. 242 at 136. As this Court has held, the 2003 MOU contained the essential terms for contract formation. Furthermore, the 2003 MOU stated clearly that "MOA, Port of Anchorage and MARAD anticipate substantial completion of Port Expansion will occur during calendar year 2008." That was the shared expectancy of the parties. Clearly, the Port was expected to be delivered by the end of 2008.

---

[7] The Court need not address Anchorage's alternative theory—reliance damages—in light of this opinion. (Reliance damages include all costs incurred in reliance on the broken promises. *See* Restatement (Second) Contracts, §349. Reliance damages allow a party to recover all damages caused by the breach, regardless whether the damages occurred before the breach. *See Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)).

[8] The Government also argues that because MARAD could terminate the Agreement at any time, this disproves that MARAD owed any Anchorage any specific item of construction. The Court disagrees. The termination clause is just standard government contracting language.

Nevertheless, the Government further argues that Anchorage cannot show that the magnitude and type of damages were foreseeable because the 2003 MOU never contemplated a clearly defined deliverable, that no specific dollar amounts were listed, and that the Project was entirely subject to the availability of non-Federal contributions and Federal appropriations. ECF No. 242 at 135. In support, the Government argues that Anchorage had only $55 million available when the 2003 MOU was executed, JX 3 at 31:2-11; Trial Tr. 792:4-20, and that that the initial estimate for the entire project was between $210 and $227 million. ECF No. 242 at 135. By now requesting approximately $100 million over the initial estimate as damages, based upon the information known in 2003, when the 2003 MOU was executed, damages in the amount of $367 million were not foreseeable. *Id*. The Court disagrees.

In 2003, the MOU was entered into between Anchorage and MARAD for MARAD to design and develop a port for Anchorage. PX 43. At that time, MARAD also entered into a contract with KSI in the amount of $210 million to begin the Project. JX 4; Stip. ¶ 14. In addition, prior to the 2003 MOU, in 1999, the Port issued a Master Plan which looked at 12 different scenarios, one of which, was estimated to cost $306 million. Stip. ¶ 6; JX 1. Thus, even in 1999 there was an estimate of over $300 million. It was, therefore, foreseeable that if the Project failed it could result in the loss of hundreds of millions of dollars. Furthermore, it was also foreseeable that an unstable structure in the Port of Anchorage would have to be removed and if it was not removed it could result in shutting down the Port entirely—as the area has extreme tides and seismic activity and a Port which provides for 90% of the merchandise goods for 85% of Alaska's populated areas pass through the Port on an annual basis.

For these reasons, the Court finds that Anchorage had an expectancy interest in damages that were foreseeable.

### 1. Impairment Damages

In the alternative, the Government argues that "[i]f the Court were to find Anchorage had an expectancy interest in the OCSP structure, Anchorage miscalculated its expectancy damages." ECF No. 242 at 136. With regard to the "impairment damages" the Government argues that the only funds that Anchorage is entitled to recover are the funds it put into the Project—$163 million. *Id*. at 139. Accordingly, certain funds must be excluded from the impairment damages calculation. In particular, the Government argues that the Federal funds should not be counted in Anchorage's damages calculations because the funds were never in Anchorage's possession. *Id*. at 137. The Government further argues that the Alaska State funds have been reimbursed to Anchorage and, therefore, are not recoverable. *Id*. at 137-38. And finally, the Government argues that the settlement paid to ICRC should not be included in Anchorage's damages. *Id*. at 138. The Court finds otherwise.

#### a. Anchorage Has Suffered a Net Capital Loss and The Federal Funds Are Recoverable

The Government asserts that Anchorage has admitted that it never received the Federal Funds and never recorded those funds as an asset or an advance, and therefore, it is not recoverable. ECF No. 242 at 136. Additionally, because both parties–the Federal Government

10

and Anchorage–lost a substantial amount of money as a result of the Project, and because both the Federal Government and Anchorage contributed capital in pursuit of a shared public policy goal—the improvement of the Port, following the *Winstar* line of cases, the Government argues "it would be only appropriate to replace Anchorage's capital that the alleged breach eliminated because additional damages would be 'duplicative.'" *Id*. at 136-37 (citing *Old Stone Corp. v. United States*, 450 F.3d 1360, 1378 (Fed. Cir. 2006)).

In applying *Old Stone* here, the Government argues that Anchorage has not suffered any net capital loss. To arrive at this conclusion, the Government calculates that Anchorage invested only $75,139,398 of its own capital and received $117,780,814 in assets as a result of the Project. Stip. ¶¶ 42, 57 (Anchorage accepted and received all of the work done between 2003 and 2008 and the dry barge berth portion of the OCSP work); JX 44 at 441 (showing breakdown of Anchorage vs. State of Alaska contributions to the project); JX 45 (impairment calculation showing total value of assets received). According to the Government, this calculation shows that Anchorage has suffered no net capital loss. Instead, the damages calculation shows that Anchorage has gained a net capital benefit gaining over $37 million from its initial investment. ECF No. 242 at 138.

The Court disagrees. As Anchorage correctly points out, the Government's argument concerning the source of funds was rejected in the *Westfed Holding, Inc. v. United States,* 407 F.3d 1352 (Fed. Cir. 2005)[9] case. In that case, the court held:

> It is inconsequential that Westfed chose to borrow the funds from investors to acquire Old Western's shares rather than use its own money. The government cites no legal authority to support distinguishing the "losses actually sustained" based on whether Westfed used its own funds or the funds of investors to whom it is indebted. Westfed is entitled to that amount it actually expended to acquire Old Western in reliance on the forbearance promise, which the government repudiated.

*Id*. at 1368. As in *Westfed*, the Court finds that Anchorage is entitled to recover the funds expended on the project no matter the source of the funds. The amount spent is undisputed, therefore, Anchorage is entitled to recover the funds, regardless of the source. In addition, the Government's argument that Anchorage received any capital gain on their initial investment of $163 million, much less a $37 million net capital gain when the Project failed, is untenable, as the evidence clearly shows that Anchorage is left with a dangerous structure that could fail at any moment which needs to be removed and the ground stabilized. These funds are, therefore, recoverable.

### b. Alaska State Funds Are Recoverable

The Government further argues that "if the court disagrees that Anchorage has received a net capital benefit based on its investment, the Court still must reduce Anchorage's claimed

---

[9] The Court notes that the *Westfed* case is relied upon by the Government for its source of funds argument.

expectancy damages amount" by $91,290,163—the Alaska State funds—which the Government argues have been reimbursed to Anchorage. ECF No. 242 at 134. In reaching this conclusion, the Government cites to the testimony of Ms. Mahoney. Her testimony, according to the Government "conceded" that the State replaced Alaska grant funds. *Id*. (citing Trial Tr. 1296:20-1297:18). Therefore, if the State funds are not deducted that would amount to double recovery. *Id*.

The Government has misconstrued Ms. Mahoney's testimony. Ms. Mahoney never "conceded" that the State had been fully reimbursed for the loss off the Alaska State grant funds. In fact, Ms. Mahoney never said that the State replaced the State funds due to the failure of the Project. Instead, Ms. Mahoney testified how Anchorage received the grant in the first instance. *See* Trial Tr. 1296:20-1297:18. These funds are, therefore, recoverable.

### c. 20212 MARAD-ICRC Settlement Is Recoverable

And finally, the Government argues that Anchorage should not be able to claim the value of the 2012 MARAD-ICRC settlement as part of its expectation damages ($11,279,059). ECF No. 242 at 138. Relying on the testimony of Mr. McGeehin, when asked by Government counsel, Mr. McGeehin admitted that he included the ICRC settlement amount at the direction of counsel and had no opinion as to whether it was appropriate to include as part of the OCSP structure. Therefore, the Government argues that relying on counsel's advice for damages is not proper and should be deducted. *Id*. However, this Court has already found that this money was spent out of Anchorage's coffers. *See* ECF No. 141. In addition, the Government concedes that the money "may have come from Anchorage funds." ECF No. 242 at 138. In light of this, and the Court's finding that the MARAD breached the 2011 MOA when it entered into the settlement agreement, Anchorage is entitled to recover this amount.

### 2. Future Damages are Recoverable

The Government asserts that Anchorage is not entitled to future damages—that is—Anchorage cannot recover its costs for removal of the structure because Anchorage "has not paid anything out of its pocket," and, therefore, "the amount claimed is not an actual loss." ECF No. 242 at 131 (citing *Westfed Holdings*, 407 F.3d at 1352). Because "potential future obligations . . . do not count yet as an actually sustained loss," *Westfed Holdings*, at 1368-69, the Government contends it would be error to award future costs to Anchorage. Moreover, the Government argues that "Anchorage has not demonstrated any legal basis to recover its theoretical future costs." ECF No. 242 at 132.

According to the Government, Anchorage's claims that its costs to remove the OCSP structure are recoverable as mitigation or incidental costs or that its theoretical removal costs are recoverable as costs necessary to remedy the defects in the structure are not supported by the cases supplied by Anchorage. *Id*. at 242 at 132 (citing ECF No. 241 at 135-36). Instead, the cases cited in support, argues the Government, disprove Anchorage's arguments for future costs. *See, e.g. Com. Contractors, Inc. v. United States*, 154 F.3d 1357, 1372 (Fed. Cir. 1998) (costs to remedy defects are available only as an alternative basis of damages when the loss in value is impossible to calculate); *Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1317 (Fed. Cir.

12

2007) (the awarded "mitigation damages" were all costs incurred in the past). Consequently, Anchorage cannot recover damages for costs not yet incurred nor can Anchorage claim remedial costs as Anchorage costs to remedy defects are available only as an alternative basis of damages when the loss in value is impossible to calculate. As Anchorage has calculated its loss in value, the Government argues, Anchorage cannot claim further costs. ECF No. 242 at 132.

However, the test is not so simple. Instead, in determining whether a party may recover future damages, the Court must determine whether the breach was a total breach or partial breach.

A total breach is defined by the Restatement (Second) of Contracts § 236 as "one for damages based on all of the injured party's remaining rights to performance. A partial breach is one for damages based on only part of the injured party's remaining rights to performance. The case of *Indiana Michigan Power* is instructive. In that case, the Court distinguished the difference between a partial breach case and a total breach case. In particular, the Court held that as some of the alleged breaches involved "remaining obligations" to be performed after the lawsuit was over, the breach was partial and, therefore, the request for future damages was denied. In comparison, MARAD missed the projected completion date of 2008 and terminated construction in 2011 due to faulty design and defective construction. When the work stopped, the OCSP foundation was not complete, causing the entire Project to stop. When the Project stopped without a completed Port and then the Project abandoned in 2011 by the Government, the Government no longer performed its obligations. Thus, any remaining obligations were breached. Therefore, the Court finds that the Government's breach constitutes a total breach for which future damages are recoverable.

The Government further argues that Anchorage is not entitled to future costs because Anchorage introduced no evidence to show that it has made any decision about the removal of the OCSP structure. ECF No. 242 at 133. In essence, argues the Government, Anchorage is asking the Court to make a finding about Anchorage's future plans based only on testimony from Mr. Playter, a CH2M Hill employee. As the Government points out, Mr. Playter admitted that neither he nor CH2M Hill has any authority to decide what the Port is going to do. *Id*. (citing Trial Tr. 1019:23-1020:14). Indeed, Anchorage could have and should have, according to the Government, chosen to present testimony from any witness currently employed by the Port or Anchorage, who could have testified as to Anchorage's intentions, but it did not. *Id*.

The testimony from Mr. Playter regarding future plans clearly shows that he and CH2M Hill are involved with Anchorage and its future regarding the Port. In fact, his responses from Plaintiff's counsel show that he considers himself, as an employee of CH2M Hill, to be part of the fix:

> BY MR. SMITH:
>
> Q. The concept D alternative that was ultimately considered, is that an economical approach to fixing what's in the North Extension?
>
> A. Yeah, it is. It's the best -- it's -- it's -- it's the best we can do. Really. It

13

maximizes -- it maintains as much of the North Extension backlands as we can maintain, you know, and it preserves as much as we can, while still stabilizing. So it's a balance. It's -- it's a very fine balance. We're working -- you know, provide as much upland as possible, but stabilize it. And that's -- that's what we've done.

**Q. To the best of your knowledge, has anybody from the Municipality expressed an intent not to stabilize that -- the North Extension?**

**A. No. They're all very supportive and they realize how important it is**. I mean, they listen to the ship -- the shippers complain about it all the time. It's just -- it's a real -- it's a real navigation hazard as it is.

Q. And it's also a safety hazard?

A. And a safety -- yeah, it's a safety hazard. I mean, you know, you've seen the sinkholes. There's sinkholes that are documented in the file. One of those could open up at any moment. If somebody was out there and a sinkhole opened up, they'd be dead.  I mean, they'd be dead quick. I wouldn't walk out there. I wouldn't build a house out there. I wouldn't park a trailer out there. I mean, it's -- it's dangerous.

Q. And why hasn't that area been stabilized to date?

A. The -- the port has -- okay. So -- so the whole port infrastructure is in a state of disrepair. And that's what the whole purpose of the original project was, to replace everything. But given the limited funding that they have right now, the first thing they need, because if there's a big earthquake right now, you could lose the whole port. You could lose the North Extension and you could lose all the existing terminals. But we built -- we've gone ahead with Phase 1 to build the PCT, so that in the event of a big earthquake and we lose everything, all existing terminals and the North Extension, we at least have the PCT to work from. Okay? So we can get fuel, we can get cement, we might even be able to get some containers offloaded.

. . .

Q. So the Port is left making decisions between several bad alternatives?

A. That's a good way to put it.

**Q. Now, have you received any direction from the assembly, the municipal assembly, that changes the future plans for the modernization project?**

*A.* **No**.

Trial Tr. 1016:4-1019 (emphasis added). The testimony clearly shows that Mr. Playter is currently involved in the Port Project, as well as his plans to be involved with the future plans to remove the dangerous structure and to stabilize the areas. His testimony clearly shows that he is aware that Anchorage is moving forward as well.

And finally, the Government argues that the evidence proved that Anchorage has rejected the removal project that Anchorage claims will occur; therefore, it is speculative. ECF No. 242 at 131-134; ECF No. 255. The Government points to the evidence that Anchorage's cost estimate is based on 35% design drawings for one portion of the port, and then extrapolated to another section of the port. Trial Tr. 1389:21-1390:8. In other words, the Government argues "Anchorage's estimate is based on an assumption that is based on another assumption. The conceptual estimate also provides a wide range of accuracy from -20% to +30% or a 50% swing of probable costs." ECF No. 242 at 134 (citing PX 5 at 3). Therefore, according to Government, the Court cannot fairly ascertain the future damages that Anchorage is claiming based on the evidence it has provided. The Court is not convinced.

Mr. Playter's testimony was clear that for safety reasons the entire structure must be removed. Trial Tr. 902:2-921:2; 1016:4-1019:11. The Court has already found that MARAD breached its Agreements with Anchorage and in doing so has misspent the initial $300 million. ECF No. 253. Now Anchorage has to fix what was created by MARAD. Anchorage's construction estimate expert, Mr. Schoonmaker, described in great detail the hundreds of hours put into his estimate. He explained that he had "as built" drawings that described in detail what had to be taken out, and both a 35% and a 95% of the design to be installed. PX 973; Trial Tr. 1352:15-20. His testimony was unchallenged by any expert from MARAD or any other witness. Thus, the testimony cited clearly meets the requirement than an estimate be sufficient for this Court to make "a fair and reasonable estimate of the damage." *Bluebonnet Savings Bank, FSB v. United States*, 266 F. 3d 1348, 1355 (Fed. Cir. 2007). The Court, therefore, finds that Anchorage proved the legal element of "reasonable certainty" to support its future damages claim.

### B. The Damage Award Is Reliable

#### 1. Impairment Damages Calculations

In its post-trial brief, Anchorage provided a summary of the lost costs/value due to the defective design and construction. However, several calculations did not add up to the numbers presented. In addition, the Court was unclear as to the supporting evidence for some of the impairment damages claim—specifically the Court requested support for the $188,980,786 on page 102 of ECF 241 of Anchorage's post-trial brief. *See* ECF No. 254. The Court ordered the parties to respond to the inaccuracies. The Government responded that the inaccurate calculations support its position that the damages amounts are unreliable and, therefore, not recoverable. ECF No. 256 at 1. Anchorage, provided the following:

> This number is a combination of a part of the calculation performed by Mr. McGeehin to reach $180,839,807, as summarized on PDX 3 page 3 (Attached

> as Ex. 1). (Tr 1168:3-1173:5). The $188,980,786 represents the costs of design and construction of the OCSP up until the work was halted in 2010.

*Id.* First, the Court notes that Anchorage still provides the wrong number. Mr. McGeehin's calculations add up to $180,839,809. However, the chart below explains how to get to the first calculation in question, **$188,980,786:**

| *Categories/Percentages* | *Total Unusable 2,435 LF* |
|---|---|
| *83.82%* | |
| OCSP-Construction Task Orders | $126,264,016 |
| OCSP Fill Materials Amounts | $5,032,192 |
| OCSP General Site Amounts | $20,260,567 |
| Subtotal | **$151,556,775**[10] |
| | |
| *Percentages 100%* | |
| OCSP Remediation Task Orders | $32,421,056 |
| OCSP Remediation General Site | $5,002,955 |
| | |
| Total amount spent on unusable OCSP: | **$188,980,786** |

Thus, to arrive at $188,980,786, you add $151,556,775 plus $32,421,056 plus $5,002,955 The references to "OCSP Remediation Task Orders" and "OCSP Remediation General Site" are for work performed by West to attempt to fix errors in prior installation and to stabilize the area before the work was shut down. Trial Tr. 1172:1-11.

In its brief, ECF No. 241, Anchorage also claimed total impairment damages in the amount of $181,092,257. According to Anchorage, the improper $181,092,257 number was the result of using a lower incorrect number for the credit for sales of sheet pile and gravel. ECF No. 255 at 2. However, as the Court has provided previously, the appropriate total impairment number should be $180,839,809.

To arrive then at $180,839,809, starting with the amount spent on the unusable OCSP, namely, $188,980,786, Mr. McGeehin subtracted amounts received for the sale of sheet pile and gravel and for the moneys received by Anchorage's settlement from the prior litigation in the Federal District Court Alaska. Mr. McGeehin also included as recoverable funds spent by the Government for the suitability study—Corps of Engineers, Task 8— and the ICRC-Government Settlement Amounts. Although Mr. McGeehin's final tally is incorrect, in order to reach $180,839,809, you add the $3,397,900 for Corps of Engineers (COE), Task 8, along with the ICRC settlement of $11,279,059 to the $188, 980,786 and then deduct the $3,467,936 for sales of sheet pile and gravel and the $19,350,000 for the Settlements from Prior Litigation.

---

[10] Again, in its original brief, Anchorage's chart and PDX 3 was $1.00 off — $151,556,774. However, if you total the numbers from PDX 3 they add up to $151,556,775

Therefore, $180,839,809 is the final summary of all impairment damages caused by the defective OCSP.[11]

| | |
|---|---|
| Amount Spent for Unusable Portions of OCSP | $188,980,786 |
| ICRC Settlement with MARAD | $11,279,059 |
| Cost of Corps of Engineers Analysis | $3,397,900 |
| Credit for sale of Sheet Pile and Gravel | ($3,467,936 |
| Subtotal | $200,189,809 |
| Less Settlement Proceeds Received by Anchorage | ($19,350,000) |
| **Total Impairment Damages** | **180,839,809** |

Other than the objections which the Court has addressed above, the Government did not challenge any other calculations with regard to the impairment damages, either by expert witness or in its initial brief. And although Anchorage's briefs and Mr. McGeehin's final tabulations did contain minor incorrect calculations, the calculations were otherwise supported by Mr. McGeehin's testimony.

Therefore, the Court finds that Anchorage has suffered damages relating to the loss in value/funds associated with the construction/impairment of the Wet Barge Berth, the North Extension and the Bulkhead in the amount of $180,839,809. The Court further finds that had the design and construction had been done properly, Anchorage would have possessed an asset valued at approximately $180,839,809 more than it is currently valued. The Court, therefore, awards the total impairment damages in the amount of $180,839,809.

### 2. Future Damages Calculations

The second category of Anchorage damages relates to the removal of the defective structure and to stabilize the area. Using AECOM's 35% design estimate summary the amounts are as follows:

| *Item* | *Description* | *Total -to nearest thousand* |
|---|---|---|
| | North Extension Stabilization | |
| 1 | Site Preparation & Management | $477,000 |
| 2 | Demolition & Excavation | $42,776,000 |
| 3 | Place Slope Protection | $15,727,000 |
| 4 | Material Disposal | $13,376,000 |

---

[11] In response to the Court's December 9, 2021 Order, Anchorage states that "the number of $180,607,000 on page 49 of ECF 248 is simply a mistake. It should have been $180,839,807." ECF No. 255 at 2. Yet again, the Court notes $180,839,807 is also an addition mistake.

| | | |
|---|---|---|
| 5 | Asphalt Paving | $135,000 |
| 6 | Soil Mixing | $36,536,000 |
| 7 | Mobilization | $11,626,000 |
| 8 | Engineering Design & Geotech | $7,516,000 |
| 9 | General & Administrative | $19,032,000 |
| 10 | Corporate Overhead & Profit | $29,440,000 |
| | Total Construction and Engineering Costs | 176,641,000 |
| 11 | Environmental & Permitting Consultant | $775,000 |
| 12 | PM/CM Consultant | $9,191,000 |

ECF No. 241 at 102.

Once again, the Government did not present any expert witnesses to challenge any of the calculations to the estimate for removing the structure and stabilizing the area in question nor did the Government challenge the actual amount—$186,607,000 (176,641,00 + 775,000 + 9,191,000) —in its brief.  *See* ECF No. 242 at 130-138.  The only criticisms raised by MARAD relate to the use of a 35% design and the extrapolation of the Step 1 design into the Step 2 area.  These criticisms have no merit.  The law only requires that the estimate be sufficient for the Court to "make a fair and reasonable estimate of the damages." *Bluebonnet Savings Bank FSB v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001).  Anchorage's evidence meets this criterion and is accepted by the Court.

The evidence was clear that the structure left by the Government on Anchorage's property by MARAD is dangerous, prevents Anchorage from using its property and creates navigational hazards.  The evidence was also clear that Anchorage has no choice but to remove the defective structure, and the cost to remove the dangerous structure is clearly recoverable.  That amount, as provided by Anchorage's expert witnesses provide that it will cost Anchorage $186,607,000 to remove the defective structure and for the cost of restoring the impacted area.  All of these damages are directly related to the failed design and construction.  Thus, but for the breach, Anchorage would not need to stabilize the area of the defective structure for safety.   The Court, therefore, awards Anchorage $186,607,000 in damages to remove the defective structure and stabilize the area.

Therefore, the Court finds that Anchorage is entitled to recover damages which were proximately caused by the defendant's breaches as they were reasonably foreseeable and were proven with sufficient certainty to permit the finder of fact to reasonably calculate damages with reasonable certainty.

### III. Conclusion

The Court finds that it can recover the loss in value of its property under an expectation damages theory.  *See* Restatement (Second) of Contracts §§ 347-348.  But for the failure of the Government to deliver a port in accordance with the terms of the parties' contract, Anchorage would have had an asset valued at $180,839,809 on its balance sheets.  Therefore, Anchorage is entitled to its impairment damages for the loss in property value due to the Government's defective work.  The impairment analysis does not, however, account for the full "diminution" in the value of the property, as the cost to remove the dangerous structure and stabilize the area must be added.  That Court finds that cost to be $186,607,000.

Therefore, the Court previously having found that the Government breached its Agreements with Anchorage, as a result, Anchorage is awarded $367,446,809 in damages.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge